**Peter PIAMBINO and Joseph F. Kucklick, Plaintiffs-Appellees,**

v.

**William E. BAILEY and David L. Eastis, Defendants,**

**and**

**Bestline Products, Inc., a California corporation, Defendant-Appellee,**

**David Sylva, Intervenor-Appellant.**

**No. 82–5844.**

United States Court of Appeals, Eleventh Circuit.

March 18, 1985.

Rehearing and Rehearing En Banc Denied May 15, 1985.

Evelyn Langlieb Greer, P.A., Miami, Fla., for intervenor-appellant.

Frank R. Ubhaus, J. Russell Pitto, San Jose, Cal., for defendant-appellee Bestline Products Inc.

Carl H. Hoffman, Coral Gables, Fla., for plaintiff-appellee Peter Piambino.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

## I.

This is a class action in which the plaintiffs seek money damages under the federal securities laws. The lawyers who have been representing the plaintiff-class have a conflict of interest with the minority segment of the class. They have used this conflict of interest to benefit themselves and the majority of the class members since the case began. On March 11, 1977, they concluded a settlement and obtained an attorney's fee award, both of which were highly unfair to the minority members. We set aside the settlement and the fee award in *Piambino v. Bailey (Piambino I)*, 610 F.2d 1306 (5th Cir.),[1] *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), and instructed the district court to grant David R. Sylva the status of an intervening party plaintiff to protect the interests of these minority members of the plaintiff-class (the "Minority Group").

When the district court received our mandate, the plaintiffs' lawyers resisted its enforcement because the proceeds of the vacated settlement had been disbursed and they had spent the attorney's fee the court had awarded them. Faced with this problem, the district court refused to enforce our mandate. Sylva now turns to us for relief.[2]

A brief synopsis of the events that led to our decision in *Piambino I* and thereafter

took place in the district court is necessary to give context to the holdings of that decision, the serious legal and ethical questions this appeal presents, and our disposition of those questions.

## A.

The plaintiffs in this case are purchasers of distributorships in a nationwide pyramid marketing scheme devised and operated by Bestline Corporation[3] to sell soap products. The plaintiffs became Bestline distributors, they allege, in reliance upon Bestline's representation that its distributors were making substantial profits and that they would also. This representation was false, and the plaintiffs lost their investments. They brought this class action, on July 20, 1973, against Bestline and its principals, contending that their distributorships were "securities" and seeking money damages under federal securities laws.

The plaintiffs comprising the Minority Group are the beneficiaries of a multimillion dollar state court judgment (the "California Judgment") the attorney general of California obtained against Bestline Corporation in 1973, about the time this litigation began, under California's consumer fraud laws. That judgment required Bestline to make periodic restitution payments into a fund (the "California Fund"), established by the judgment, for distribution to Bestline's California distributors. David R. Sylva is the trustee of that fund; he is

---

1. *Piambino I* was decided by our predecessor circuit, the former Fifth Circuit. On October 1, 1981, that circuit divided into the new Fifth Circuit and our Eleventh Circuit. Throughout this opinion we treat *Piambino I*, which is binding on this court, as if the Eleventh Circuit had decided it. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

2. We treat Sylva's appeal as a petition for a writ of mandamus pursuant to 28 U.S.C. § 1651 (1982) because there is some question whether the district court's action in failing to follow our mandate constitutes a final judgment reviewable under 28 U.S.C. § 1291 (1982). *See United States v. Haley*, 371 U.S. 18, 83 S.Ct. 11, 9

L.Ed.2d 1 (1962); *United States v. United States District Court*, 334 U.S. 258, 263, 68 S.Ct. 1035, 1037, 92 L.Ed. 1351 (1948); *United States v. Ritter*, 273 F.2d 30 (10th Cir.1959), *cert. denied*, 362 U.S. 950, 80 S.Ct. 863, 4 L.Ed.2d 869 (1960); *cf. Baltimore & O.R. Co. v. United States*, 279 U.S. 781, 785, 49 S.Ct. 492, 493, 73 L.Ed. 954 (1929); *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255–56, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895).

3. Bestline Corporation, a California corporation, is the parent corporation of a wholly-owned subsidiary, Bestline Products, Inc., also a California corporation and also a defendant in many of the lawsuits discussed *infra*. These two entities will be referred to, collectively, as Bestline.

charged with the responsibility of approving the distributors' claims and forwarding Bestline's restitution payments to them.

Soon after they filed the present class-action suit, if not before, it became evident to the plaintiffs' lawyers ("Lead Counsel") that Bestline would lack sufficient financial resources to make a significant settlement offer, or to satisfy any judgment the plaintiff-class might obtain after a trial on the merits, and to pay them an attorney's fee, if Bestline continued making restitution payments to their clients in the plaintiff-class who were beneficiaries of the California Judgment, *i.e.*, the Minority Group. Lead Counsel therefore took steps to stop the flow of money from Bestline to these clients.

First, Lead Counsel appeared before the Superior Court of Los Angeles County, whose judgment was providing the vehicle for Bestline's restitution payments, and requested that court to impose a constructive trust on the California Fund for the benefit of their clients in the plaintiff-class who were not beneficiaries of the California Judgment (the "Majority Group"). The Superior Court rejected Lead Counsel's request. Lead Counsel then brought suit in the U.S. District Court for the Northern District of California. They named as plaintiffs the entire plaintiff-class now before us (the Majority and the Minority Groups) and as defendants, among others, Sylva,[4] the Superior Court of Los Angeles County, and the California attorney general. Lead Counsel asked the district court to enjoin Sylva from distributing to the Minority Group the restitution funds Bestline was paying into the California Fund on

the grounds, *inter alia*, that the California Judgment, by not providing for restitution to the Majority Group, denied the members of that Group rights secured by the ninth[5] and fourteenth[6] amendments to the U.S. Constitution. The district court refused to grant the injunction and dismissed the case, with prejudice, for failure to state a claim for relief.[7] *See* Fed.R.Civ.P. 12(b)(6).

Having failed in California, Lead Counsel turned to the district court below for relief. The district court had previously determined, on plaintiffs' motion for summary judgment, that the distributorships plaintiffs had purchased from Bestline were securities within the meaning of the federal securities laws, and the parties were in the process of preparing for trial. On June 18, 1976, Lead Counsel moved the court to enjoin Bestline Corporation from making a $500,000 restitution payment to the California Fund that was due on June 30. In urging the court to issue the injunction, they pointed out that Bestline was rapidly disposing of its assets and that, unless the court took action, Bestline would soon have no assets to pay the plaintiffs' claims. On June 30, the district court preliminarily enjoined Bestline from making the payment due that day and ordered it to deposit the sum of $500,000 in the registry of the court. The court further enjoined Bestline from making any subsequent payment called for by the California Judgment.

Bestline objected to the issuance of this injunction on the ground, *inter alia*, that the court had not required the plaintiffs to post a bond as required by Fed.R.Civ.P.

**4.** H. Lee Holden, Sylva's predecessor as trustee of the California Fund, was actually named as defendant. When Sylva replaced Holden as trustee he was substituted as the proper party defendant.

**5.** The ninth amendment to the U.S. Constitution provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

**6.** Section One of the fourteenth amendment to the U.S. Constitution provides that:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**7.** The court made its ruling in an unpublished memorandum order.

65(c).[8] In response, the court said that Bestline's $500,000 deposit would serve as the plaintiffs' bond and would remain in the court's registry as long as the injunction remained in effect.

Bestline immediately appealed the district court's injunctive order to this court. While Bestline's appeal was pending, Lead Counsel negotiated a settlement with Bestline and twenty-seven of the individual defendants. On January 28, 1977, the district court preliminarily approved the settlement. Two weeks later, Sylva moved the court to intervene as a party plaintiff, representing the Minority Group. He requested the court to designate that Group a plaintiff-subclass, claiming that Lead Counsel's representation of both the Majority and the Minority Groups constituted a conflict of interest.

Sylva sought to intervene for two reasons: to seek the vacation or modification of the injunction that was preventing Bestline from fulfilling its obligations under the California Judgment, and to contest the settlement the court had preliminarily approved. Sylva objected to the settlement because most of the members of the Minority Group would not share in the proceeds thereof and because, under its terms, Bestline would be precluded from making further restitution to that Group under the California Judgment.

The district court entertained Sylva's motion to intervene on March 11, 1977, at a hearing on Lead Counsel's application for the final approval of the aforementioned settlement and the award of an attorney's

fee and expenses. The court denied Sylva's motion as untimely and meritless, without further explication. It then addressed the propriety of the settlement and the issue of Lead Counsel's attorney's fee and litigation expenses. The court approved the settlement as "fair, reasonable and adequate" and, stating that there were no objections, approved Lead Counsel's request for a $750,000 attorney's fee and $50,000 in expenses. Three days later, the clerk of the court disbursed the fee to Lead Counsel out of funds on deposit in the court's registry.

On April 1, 1977, Sylva took an appeal from the district court's order denying his motion to intervene; at the same time, he moved the district court to stay the execution of the settlement and to set aside the attorney's fee the clerk had disbursed to Lead Counsel. The district court, on May 2, 1977, refused to set aside the fee disbursement or to grant the stay, and, by the time we heard Sylva's appeal, the district court had disbursed all of the settlement proceeds to the eligible members of the plaintiff-class.

## B.

On December 5, 1980, we decided *Piambino I*, 610 F.2d 1306 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), Sylva's appeal and Bestline's earlier appeal from the district court's preliminary injunction,[9] which had been consolidated for argument and decisional purposes.[10] We reversed the district court's order enjoining Bestline from mak-

---

**8.** Fed.R.Civ.P. 65(c) provides:

(c) **Security.** No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

**9.** Although the settlement between Bestline and the plaintiff-class would have ordinarily mooted Bestline's appeal, *see United Airlines, Inc. v. McDonald*, 432 U.S. 385, 400, 97 S.Ct. 2464, 2473,

53 L.Ed.2d 423 (1977), the possibility that Sylva might be permitted to intervene, as the representative of the Minority Group, to contest the validity of the injunction, the settlement, and Lead Counsel's attorney's fee and expense award kept the controversy alive and ripe for appellate review.

**10.** In its notice of appeal, Bestline also sought review of the district court's partial summary judgment which determined that Bestline's distributorships were securities. The partial summary judgment was not appealable. *See infra* note 56. This point, however, is not germane to this appeal.

ing the restitution payments called for by the California Judgment, because that order had no basis in law. *Id.* at 1334. We also reversed the district court's order denying Sylva intervention, concluding that the court should have allowed him to intervene in behalf of the Minority Group because its interests were at odds with those of the Majority Group and were not being adequately represented by Lead Counsel. Accordingly, we instructed the district court, on remand, to treat Sylva as a party plaintiff.

Most of the factors that counseled our decision on the intervention issue made clear the unfairness of the settlement. We therefore vacated the settlement. Having taken this action, we could not allow the district court's award of an attorney's fee and expenses to stand; accordingly, we set it aside as well.

Our decision in these consolidated appeals swept beyond the foregoing issues and reached the district court's summary judgment determination that Bestline's distributorships constituted securities. We found a genuine issue of material fact as to whether these distributorships were securities and thus vacated that ruling. In sum, we restored the *status quo ante.* We anticipated that, following the issuance of the mandate, the case would go forward in the district court as if the parties had just joined issue and Sylva had intervened as a party plaintiff, representing the Minority Group.

What we anticipated would occur in the district court has not transpired, however. Rather, Lead Counsel have attempted to avoid the consequences of our decision in order to preserve the settlement and their award of a fee and expenses. They have been so motivated because the settlement proceeds have been disbursed and their fee has been "spent." [11] Bestline and the twenty-seven individual settling defendants have also attempted to preserve the settlement. Bestline, whose assets have been liquidated as required by the settlement, has tended to be indifferent. The twenty-

seven individual defendants, however, have been far from indifferent. If the district court were to treat their settlement as a nullity and they had to proceed to trial, they would be exposed to substantial liability and, moreover, would have to finance their defense of the case. The defendants have therefore joined ranks with Lead Counsel in their attempt to preserve the settlement they made.

Lead Counsel's first step in pursuit of this goal was to move the district court to amend its original class certification order to eliminate the Minority Group; with that Group out of the case, Lead Counsel and the defendants could recast their settlement and present it to the court for approval. While this motion was pending, the district court, acting *sua sponte*, issued an order on our mandate. The order followed the letter of the mandate with one exception; it refused to grant Sylva intervention as a party plaintiff. The court then granted Lead Counsel's pending motion, severing the Minority Group from the plaintiff-class. Sylva, upon learning of the entry of these two orders, moved the court to grant him intervenor status *instanter*, as directed by our mandate. He also moved the court to order the plaintiffs and Lead Counsel to transfer to the California Fund the monies they had received as a result of the settlement, contending that such action was mandated. The district court denied Sylva's motion in its entirety, and Sylva perfected this appeal.

### C.

Sylva presents two claims of error. He contends, first, that our mandate required the district court to grant him immediate status as an intervenor, representing the Minority Group, and that the district court could not avoid this obligation. Second, he contends that the mandate, by clear implication, required the district court to order Lead Counsel and the members of the plaintiff-class who shared in the settlement to pay to the California Fund all of the

---

**11.** Lead Counsel informed us of this fact during the oral argument of this appeal.

monies they have received, including the $500,000 June 30, 1976 restitution payment the district court enjoined Bestline to deposit in the registry of the court.

Lead Counsel, appearing solely in behalf of the Majority Group since the Minority Group has been severed from the plaintiff-class, contend in response that our mandate does not call for the relief Sylva seeks. With respect to Sylva's first point, Lead Counsel argue that we did not grant Sylva intervention; rather, we held that Sylva's motion to intervene had been timely and meritorious but left it to the district court to determine whether the motion met the procedural requirements of Fed.R.Civ.P. 24(c).[12] They suggest that the district court refused to grant Sylva intervention because his motion for leave to intervene failed to meet those procedural requirements.

With respect to Sylva's second claim of error, Lead Counsel argue, alternatively, that our mandate did not contemplate a return of the monies paid out in connection with the settlement, and that, if it did, we should not enforce the mandate because it has no basis in law and is manifestly unjust. Bestline and the twenty-seven individual defendants join in Lead Counsel's arguments and urge us to affirm the district court.

We reverse. We hold as follows: First, *Piambino I*, and its mandate, correctly obligated the district court to grant Sylva intervention as a party plaintiff, representing the Minority Group. The district court's refusal to grant such intervention and its later action in deleting the Minority Group from the plaintiff-class violated that provision of the mandate.

Second, the *status quo ante* the *Piambino I* panel clearly intended cannot be achieved if those who participated in the settlement retain the monies they have received. We therefore instruct the district court, upon receipt of the mandate that

issues with our decision in this appeal, to order the plaintiffs and Lead Counsel to pay such monies into the district court's registry.

Third, Lead Counsel, having a patent and substantial conflict of interest not only with Sylva and the Minority Group but with the Majority Group as well, are disqualified from representing any party in this case, save themselves. We set forth our reasons for these holdings *seriatim*, in Parts II.A., B., and C. below.

## II.

A trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate. *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895). The trial court must implement both the letter and the spirit of the mandate, *Nixon v. Richey*, 513 F.2d 430, 435–36 (D.C.1975), *aff'd on other grounds*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492, 541 (8th Cir.1975) (en banc), taking into account the appellate court's opinion, *In re Sanford Fork & Tool Co.*, 160 U.S. at 256, 16 S.Ct. at 293 (1895); *Cherokee Nation v. Oklahoma*, 461 F.2d 674, 678 (10th Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972), and the circumstances it embraces. *Sherwin v. Welch*, 319 F.2d 729, 731 (D.C.Cir.1963). Although the trial court is free to address, as a matter of first impression, those issues not disposed of on appeal, *Holcomb v. United States*, 622 F.2d 937, 940 (7th Cir.1980); *see also, Dorsey v. Continental Casualty Co.*, 730 F.2d 675, 678, 679 (11th Cir.1984), it is bound to follow the appellate court's holdings, both expressed and implied. *Cherokee Nation*, 461 F.2d at 678; *see also* 1B J. Moore, J. Lucas, & T. Currier *Moore's Federal Prac-*

---

**12.** Fed.R.Civ.P. 24(c) provides in pertinent part:

 **(c) Procedure.** A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion

shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought.

*tice* ¶ 0.404[10] (2d ed. 1984). If the trial court fails fully to implement the mandate, the aggrieved party may apply to the appellate court for enforcement, by petitioning for a writ of mandamus.[13]

■ The "mandate rule," as it is known, is nothing more than a specific application of the "law of the case" doctrine. *Greater Boston Television Corp. v. Federal Communications Commission,* 463 F.2d 268, 279 (D.C.Cir.1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); *City of Cleveland v. Federal Power Commission,* 561 F.2d 344, 348 (D.C.Cir.1977). This doctrine stands for the proposition that an appellate decision on an issue must be followed in all subsequent trial court proceedings unless the presentation of new evidence or an intervening change in the controlling law dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice. *Westbrook v. Zant,* 743 F.2d 764, 768–69 (11th Cir.1984); *Baumer v. United States,* 685 F.2d 1318, 1320 (11th Cir.1982) (quoting *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967)).

■ The law of the case doctrine is not an "inexorable command," *White v. Murtha,* 377 F.2d at 431, but rather a salutary rule of practice designed to bring an end to litigation, *id.,* discourage "panel shopping," *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 662 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975), and ensure the obedience of lower courts. *United States v. Williams,* 728 F.2d 1402, 1406 (11th Cir.1984). As with the mandate rule, the law of the case doctrine applies to all issues decided expressly or by necessary implication; it does not extend to issues the appellate court did not address. *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 19 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974); *Fogel v. Chestnutt,* 668 F.2d 100

(2d Cir.1981), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). With these legal principles in mind, we turn to the holdings we reach in this appeal.

### A.

■ Sylva contends that our decision in *Piambino I* explicitly gave him intervenor status and that the district court, on receipt of our mandate, should have accorded him such status without further consideration. Lead Counsel contend, in response, that our decision did not conclusively adjudicate Sylva's right to intervention; rather, it left to the district court the task of determining whether Sylva's motion to intervene met all of the procedural requirements for intervention prescribed by Fed.R.Civ.P. 24(c) and thus should be granted.[14] Lead Counsel suggest that the district court has now made this determination, concluding that Sylva failed to comply with Rule 24(c) because he did not file with his motion to intervene a separate pleading setting forth the claims he desired to prosecute, and has properly denied Sylva's motion. Although the court did not cite this procedural failure, or any other reason, for its ruling, we will assume, for discussion purposes, that the court based its ruling on such failure.

Sylva's failure to file a separate pleading setting forth his claims for relief could not have justified the district court's departure from this court's decision in *Piambino I* that Sylva be accorded intervention as a matter of right. As we have stated, the law of the case doctrine extends to every issue the reviewing court has decided, both explicitly and by necessary implication. Although our opinion did not explicitly address the procedural requirements of Rule 24, its command that Sylva be allowed to intervene necessarily implied that any procedural noncompliance with Rule 24 on his part was inconsequential. *Accord Walston v. School Board of City of Suffolk,* 566 F.2d 1201, 1205 (4th Cir.1977) (appellate

---

**13.** *See supra* note 2.

**14.** The *Piambino I* panel found, in addressing the question of Sylva's intervention, that he had a genuine and significant stake in the controver-

sy and met the real party in interest requirements of Fed.R.Civ.P. 17(a). *Piambino I,* 610 F.2d at 1322–23. No one questions the correctness of this determination.

court's determination that school teacher was entitled to various remedies for the discriminatory practices of her employer implied that her failure properly to name herself as party plaintiff would not justify dismissal of her action on remand); *Fogel v. Chestnutt,* 668 F.2d at 105, 108–09 (appellate court's determination that defendants were liable to private plaintiffs for damages under the Investment Company Act implied that there existed under that act a private right of action).

The conclusion that we did not contemplate a subsequent district court resolution as to the procedural adequacy of Sylva's motion to intervene does not end the matter, however. We must now proceed one step further and decide whether the district court's refusal to follow our mandate, though not explained, could have been based on any of the exceptions to the law of the case doctrine we have mentioned. *See supra* text at 1120.

The district court's refusal could not have been based on the first exception, new evidence, because the parties presented no new evidence on the intervention issue. The second exception, involving an intervening change in the controlling law, could not have applied, because the law has not changed. The court could not have invoked the third exception, because our decision that Sylva was entitled to intervene as a matter of right was not clearly erroneous and, when implemented, will not work a manifest injustice. Our decision was not clearly erroneous, we are convinced, because Sylva's motion was timely and had merit, and his failure to file a pleading in the nature of a complaint as required by Rule 24(c) was inconsequential. Lead Counsel concede, as they must, the timeliness and merit of Sylva's motion; their argument is that we committed clear error, and created a manifest injustice, in attaching no legal significance to Sylva's procedural default.

Rule 24(c) requires that a motion to intervene shall be accompanied by a pleading setting forth the claim or defense the movant seeks to present. Some courts of appeals have denied intervention to movants who have failed strictly to heed the requirements of Rule 24(c), *see, e.g., Abramson v. Pennwood Investment Corp.,* 392 F.2d 759, 761–62 (2d Cir.1968), but the majority of circuits, including this circuit, has not, choosing instead to disregard nonprejudicial technical defects. *Farina v. Mission Investment Trust,* 615 F.2d 1068, 1075 (5th Cir.1980) (court treats motion to remove as motion to intervene, noting that a contrary position would render federal pleadings excessively technical contrary to Fed.R.Civ.P. 8(e)(1) and 8(f)). *See also, e.g., Howse v. S/V "Canada Goose I",* 641 F.2d 317, 319 & n. 3 (5th Cir.1981); *Spring Construction Co. v. Harris,* 614 F.2d 374, 376–77 (4th Cir.1980).

Sylva's failure to annex a complaint to his motion to intervene could not possibly have prejudiced the plaintiff-class or the defendants in this case. Everyone knew the nature of Sylva's substantive claims for relief; they were the very claims Lead Counsel had asserted in their complaint. Sylva sought intervention not to prosecute different, or additional, claims against the defendants, but only to protect the minority members of the plaintiff-class; Lead Counsel, he argued, were not properly representing the interests of these members.

Lead Counsel point out that Sylva also wanted the court to lift the injunction that had stopped the flow of restitution payments from Bestline to the California Fund and thus had a new claim to present. We do not view this ground for intervening as an additional claim, however; Sylva was merely renewing Bestline's previously articulated objection to the injunction. Even if we were to treat it as a new claim, we would have to conclude that Sylva satisfied Rule 24(c)'s separate pleading requirement because his motion to intervene, and the accompanying papers, clearly spelled out his position on the propriety of the injunction. An additional "pleading," which merely replicated these documents, would have been surplusage.

In sum, our *Piambino I* decision to accord Sylva intervention, though he had not

filed a separate pleading containing his claims for relief, was not clearly erroneous. Moreover, that decision, when finally implemented, will not work a manifest injustice. In fact, the contrary is true; if the decision is not implemented, we will have worked manifest injustice on the Minority Group.

We therefore instruct the district court, on receipt of our mandate, to accord Sylva intervenor status *instanter*. It necessarily follows that the district court shall treat its order severing the Minority Group from the plaintiff-class, as void *ab initio*.

### B.

Sylva contends that *Piambino I*, by clear implication, calls for Lead Counsel and the plaintiffs who shared in the settlement to pay over to the California Fund all the monies they have received, including the $500,000 bond (posted pursuant to Fed.R. Civ.P. 65(c) after the district court enjoined Bestline's restitution payments to the Fund) which the court erroneously dissolved and turned over to Lead Counsel and the plaintiffs. Lead Counsel and the defendants, in response, argue that *Piambino I* cannot be read in this manner. They argue, alternatively, that, if it is, such a reading would amount to clear error and will lead to manifest injustice. We should therefore invoke the third exception to the law of the case doctrine and refuse to enforce the mandate.

As we have indicated in the summary of our holdings, *see supra* text at 1119, the *Piambino I* panel, in setting aside the settlement and the attorneys' fee award and in granting Sylva intervention, intended to achieve the *status quo ante*. Obviously, that status could not be achieved if Lead Counsel and the plaintiffs who participated in the settlement retain the monies they have received. We therefore conclude that implicit in the panel's decision is the holding that the district court order these recipients to restore such monies to the court's registry.

This holding is implicit for several reasons. First, the settlement was the product of an unlawful injunction. Without the injunction, Bestline would have satisfied the California Judgment and would have had few, if any, resources remaining to devote to this case. Second, the settlement was patently unfair to the Minority Group. Lead Counsel and the settling defendants, acting in concert, created the settlement proceeds and the monies used to pay Lead Counsel's fee and expenses principally out of Bestline resources that, absent Lead Counsel's intervention, would have gone to the Minority Group; moreover, they prevented that Group from sharing in those proceeds equally with the other members of the plaintiff-class. Third, the settlement was patently unfair even to the other members of the plaintiff-class, because, as the *Piambino I* panel observed, the settlement provided for the payment to Lead Counsel of a substantial attorney's fee and expenses (out of funds that, presumably, would have gone to the plaintiff-class) even though the litigation generated "no common fund from which to pay attorneys' fees and expenses." *Piambino I*, 610 F.2d at 1330. Fourth, the negotiation and subsequent judicial approval of the settlement was markedly tainted by, if not the direct result of, a stark conflict of interest between Lead Counsel and his clients in the Minority Group. Fifth, to allow Lead Counsel and the plaintiffs for whose benefit the settlement was crafted to retain the fruits of the settlement under the circumstances presented here would seriously disparage the rule of law.

We are also convinced that the district court could not, and cannot now, refuse to implement *Piambino I*'s implied holding—that the fruits of the settlement be paid into the district court's registry—under any of the three exceptions to the law of the case doctrine. The first exception, that new evidence justifies a departure from the appellate court's decision, is inapplicable because there was, and is, no new evidence, save Lead Counsel's announcement that the money has been spent. The second exception cannot come into play because there has been no change in the controlling law that would counsel a result different

from that reached in *Piambino I.* The third exception, the one Lead Counsel would invoke, could not, and through the passage of time cannot, be relied upon; making Lead Counsel and the plaintiffs return the monies they have received is not a clearly erroneous decision and will not work a manifest injustice. This conclusion becomes inescapable when one examines the magnitude of Lead Counsel's conflict of interest in this case and the causal relationship between that conflict of interest and the critical, and substantial, errors the district court made to the detriment of Sylva and the Minority Group.

We begin our examination by revisiting in greater detail than we have some of the events that took place before this litigation began and the bold facts which put Lead Counsel on actual notice that they had a substantial conflict of interest with their own clients in this case, the Minority Group. We then describe how Lead Counsel exploited this conflict. Finally, we deal with the question of whether it would be clear error and manifestly unjust to require Lead Counsel and the plaintiffs to pay the monies they have received into the registry of the district court.

### 1.

The history of Bestline Corporation and its promoters has been reported extensively. *See, e.g., Piambino I, supra; United States v. Bestline Products Corporation,* 412 F.Supp. 754 (N.D.Cal.1976); *People v. Bestline Products, Inc.,* 61 Cal.App.3d 879, 132 Cal.Rptr. 767 (1976). We repeat that history to the extent necessary to place our holdings, those in *Piambino I* and those we reach today, in perspective.

Bestline was organized in 1966 by William E. Bailey and Jerry Brassfield for the purpose of manufacturing and selling soap products for home use. Both Bailey and Brassfield had considerable experience in marketing consumer products through pyramid distribution systems,[15] and they formed a "pyramid" system [16] to distribute Bestline's products. At the bottom of the pyramid were "local distributors" who paid nothing for their distributorships.[17] They bought Bestline's products at 70% of the retail price and sold them to consumers, thus making a gross profit of 30%.[18] Local distributors were mostly housewives who were looking for a way to supplement the family income with part-time work. They usually sold their products to friends and neighbors who would gather for a demonstration party at the distributors' homes.

At the next level of the pyramid were "direct distributors." They paid Bestline approximately $3,000 [19] for their distributorships.[20] For that payment, they were entitled to receive Bestline's soap products with a retail value of $5,000, which they could sell directly to consumers or to local distributors. They were also entitled to purchase additional products from Bestline, for similar resale, at 48% of the retail price.

At the top of the pyramid were "general distributors." They were former direct distributors who had recruited for Bestline two other direct distributors and paid Bestline $600, ostensibly to help Bestline offset

---

**15.** One of the companies they had been involved in was Holiday Magic, Inc., itself the subject of litigation similar to the Bestline litigation. See *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173 (9th Cir.1977).

**16.** *See generally* Note, *Pyramid Schemes: Dare to be Regulated,* 61 Geo.L.J. 1257 (1973), for an overview of pyramid sales schemes and the attempts made by both the federal and state governments to regulate or prohibit such schemes.

**17.** They were required to pay a nominal sum of $5 annually as dues.

**18.** A local distributor could receive an additional discount, in the form of a rebate, if his monthly sales exceeded $4,800. This fact is not material to the issues before us.

**19.** This price varied over time but never fell below $3,000.

**20.** One could also become a direct distributor by first becoming a local distributor and then selling at least $5,600 in retail value of Bestline products in one month. These were known as "work-in" direct distributorships. This path to direct distributorship was far less common, however, than the straight cash purchase of such distributorships.

the cost of operating its general distributors school which they were never required to attend.[21] General distributors were entitled to purchase Bestline products at 40% of the retail price and to sell them to consumers or to local or direct distributors. They were also entitled to continue recruiting direct distributors. For each direct distributorship a general distributor sold, Bestline paid him a $400 commission.[22] A general distributor therefore needed to sell nine direct distributorships or $6,000 worth of soap products to recoup his $3,600 investment. Considering that the typical home sales party usually grossed no more than $75 to $100 in sales, it would take a general distributor, operating at a 60% profit margin, from a year to a year and a half, at a party a week, to recoup his initial investment. A direct distributor, operating at a 48% profit margin, would take about the same amount of time to recoup his investment.

It proved to be well nigh impossible for a general or direct distributor to make any money selling soap. They thus devoted their time and efforts to selling direct distributorships which they believed would net them substantial commissions. Bestline encouraged them to sell such distributorships rather than soap products because Bestline could earn far more from the sale of distributorships than from the sale of soap products. Bestline's profits were even greater if a direct distributor, after paying Bestline for his distributorship, chose not to take delivery of the soap to which he was entitled, for in such a case Bestline made a profit of at least $2,600.[23] It was not at all uncommon for a direct distributor to request that none of his soap products be delivered.

Most direct distributorships were sold at "Opportunity Meetings." These meetings, of which dozens, perhaps even hundreds, were held daily throughout the United States, typically took place in large hotel meeting rooms in the evening. Although these meetings were staged by Bestline, the general and direct distributors, who were dependent upon their success, provided the prospective purchasers and the majority of the financing for the meetings. Bestline showed these prospects how a Bestline distributor could earn a five or six figure annual income even in his spare time by recruiting other distributors. Bestline further represented that the supply of future distributors was inexhaustible. Invar-

---

21. One could also become a general distributor by recruiting one other direct distributor and generating a sales volume of $5,000 in a single month. As with the "work-in" direct distributorship, *see supra* note 20, this was a far less common method of advancement.

22. This $400 was equivalent to the difference between the general distributor's discount (60%) and the direct distributor's discount (52%) on the $5,000 worth of products which a direct distributor was entitled to take delivery of when he purchased his direct distributorship. Thus, Bestline attempted to make it appear that it was not compensating distributors for recruiting other distributors. The fact that direct distributors were never required to take delivery of the products they "purchased" with their initial $3,000 investment, *see infra* text at 1125, belies this fact.

In addition to this commission, Bestline created another means by which it compensated general distributors for recruiting others to become direct distributors, known as the "Special Incentive Bonus." To be eligible for the bonus, a general distributor, or those in the general distributor's pyramid (i.e., direct or local distributors whom he had recruited) were required to generate at least $36,000 of "product movement." Although "product movement" included sales of Bestline products to the public or the sales of such products between distributors at different levels in the pyramid, it consisted primarily of the "sale" of products by a general distributor to a direct distributor at the time the direct distributorship was purchased. Again, a general distributor was considered to have "sold" or generated $5,000 worth of product movement regardless of whether the direct distributor actually took delivery of the products. Bestline paid a general distributor a 3.3% commission on all product movement if he generated from $36,000 to $200,000 worth of product movement and a 15% commission on all product movement if he generated over $200,000 of product movement. Each direct distributor recruited who later rose to the level of general distributor generated about $15,000 worth of product movement.

23. This is equivalent to the direct distributor's initial investment of $3,000 less the $400 commission Bestline was required to pay his sponsoring general distributor.

iably, several distributors would appear on the program to bear witness to these representations.

Bestline's representations were false. Few of those who purchased direct distributorships ever rose to the level of general distributor, and few of those who achieved general distributorship status ever recouped their investment, much less earned substantial profits.[24] Bestline's representation that there was an endless supply of potential distributors was also false. As a community became saturated with Bestline distributors, a distributor's chance of recovering any of his investment diminished.

Unlike the plight of the majority of its distributors, Bestline and its principals prospered. Bestline's sales organization expanded to all fifty states and several foreign countries. Top executives received handsome six figure salaries and enjoyed such perquisites as access to the company yacht and aircraft. As Bestline's pyramids grew, it produced more and more dissatisfied distributors. Many turned to the Federal Trade Commission and to state and local consumer protection agencies for relief.

The Federal Trade Commission (FTC) was the first to take formal action. On July 22, 1970, the FTC commenced administrative proceedings against Bestline and William E. Bailey[25] under 15 U.S.C. § 45(b) (1982).[26] In its complaint, the FTC charged Bestline with operating an unfair and deceptive multilevel marketing plan under which persons were lured into purchasing distributorships by the promise of large financial rewards, when in fact such rewards depended on a "virtually, endless recruiting of participants into the scheme" and were "necessarily predicated on the exploitation of others who [had] virtually no chance of receiving a return on their investment."[27] Although refusing to admit that the acts and practices condemned in FTC's complaint violated any laws, Bestline and Bailey consented to the entry of a cease and desist order under which Bestline would abandon its pyramid marketing scheme.[28]

24. The California Court of Appeals, in *People v. Bestline Products, Inc.,* 61 Cal.App.3d 879, 132 Cal.Rptr. 767, 775 (1976), found that 87% of the direct distributors recruited in California from January 15, 1971, through November 30, 1972, never rose to the level of general distributor. And of those who did rise to the level of general distributor, 80.7% received commissions and bonuses of less than $5000, with the median being less than $1,000. The court concluded that "most of the new direct and general distributors did not even recoup the investment they made to acquire the initial inventory." *Id.*

25. The FTC also proceeded against Robert W. Depeu, another Bestline officer. Depeu subsequently left Bestline, however, and the FTC dropped him from the case.

26. 15 U.S.C. § 45(b) provides in pertinent part:

Whenever the [FTC] shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the [FTC] that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect. . . .

27. The FTC's description of Bestline's scheme is more fully set forth in *United States v. Bestline Products Corp.,* 412 F.Supp. 754, 759 (N.D.Cal. 1976).

28. Specifically, the cease and desist order prohibited Bestline from: (1) operating a program where financial gains were dependent upon the successive recruitment of others; (2) paying bonuses or commissions for the recruitment of others; (3) paying bonuses or commissions in connection with the sale of products unless the recipient performs a bona fide supervisory, distributive or selling function and the products are actually delivered to the buyer; (4) requiring participants to purchase products or pay other consideration beyond the actual cost of necessary sales materials; (5) using a scheme wherein profits are dependent on chance rather than skill; (6) using a scheme that fails to inform participants that all contracts for participation may be cancelled within three days; (7) representing the amount of money a participant might earn; (8) representing that it is not difficult to recruit others; (9) representing that it is easy to move up the ladder of distributorships; (10) representing that all participants will succeed; (11) representing that the supply of new recruits is inexhaustible; and (12) failing to disclose the terms of the cease and desist order to prospective distributors.

At the same time the FTC was proceeding administratively against Bestline, the attorney general of the State of California, acting in the name of the people of California, brought suit against Bestline and several of its principals, including Bailey, in California state court, seeking relief similar to that sought by the FTC. Settlement negotiations ensued. Subsequently, the defendants entered into a consent decree with the State whereby they agreed to cease operating their pyramid scheme and making false representations about a Bestline distributor's prospects of success.

Despite the entry of this consent decree, Bestline continued to market its product as it had in the past, thus prompting the California attorney general to seek stronger measures. On May 12, 1971, the attorney general, acting for the benefit of Bestline's California distributors, filed suit in the Superior Court of Los Angeles County against Bestline and Bailey and several other Bestline officers under California's consumer fraud laws.[29] The attorney general sought several forms of relief. First, he asked the court to enjoin Bestline from operating its pyramid scheme. Second, he sought restitution from Bestline for the losses the California direct distributors had sustained as a result of their purchases of direct distributorships. Third, he sought the imposition of civil penalties. The case went to trial, and the court found against the defendants. In its final judgment, entered July 25, 1973, the court ordered Bestline to dismantle its pyramid scheme, required Bestline and Bailey to make restitution to several thousand California direct distributors (Bestline being primarily liable; Bailey being secondarily liable), and imposed civil penalties of $1,000,000 against Bestline, $250,000 against Bailey, and a total of $200,000 against the other individual defendants. To effectuate such restitu-

**29.** Specifically, the California attorney general charged the defendants with having violated Cal.Bus. & Prof.Code § 17500 (West 1979) which provided in pertinent part:

**False or misleading statements.** It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this State, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services, professional or otherwise, so advertised at the price stated therein, or as so advertised.

The attorney general introduced as evidence of this charge the consent decree entered into between the defendants and the State of California. He also charged the defendants with having violated Civil Code § 3369(2) (West 1979) and Cal.Penal Code § 327 (West 1979) which provided as follows:

Cal.Civil Code § 3369(2):

Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction.

Cal.Civil Code § 3369(3) (West 1979) defined "unfair competition" as follows:

As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive.

Cal.Penal Code § 327 (West 1979) provided:

§ 327 Endless chain scheme

Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a misdemeanor. As used in this section, an "endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant. Compensation, as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.

tion, the court provided for the appointment of a receiver who would process the claims of distributors and determine the amounts due them.

By the time the superior court entered its judgment, Bestline had instituted Chapter 11 reorganization proceedings [30] in the bankruptcy court of the Northern District of California. The bankruptcy court immediately stayed the enforcement of that judgment and any further proceedings against Bestline.

With this stay order in place, Bestline and its codefendants moved the superior court to vacate its judgment on the ground that Bestline's pyramid structure and marketing practices were not in violation of California state law. In the alternative, Bestline moved the court to modify the remedial provisions of its judgment providing for restitution and penalties. While these motions were pending, the Bestline defendants entered into negotiations with the California attorney general as to some modifications the court might incorporate into its final judgment. They eventually came to an agreement and jointly proposed several modifications to the superior court. The court accepted the parties' suggestions and on December 21, 1973, after the Chapter 11 bankruptcy court's stay order had been dissolved, denied the defendants' motion to vacate the judgment and entered a modified judgment (the California Judgment), incorporating the agreed-upon changes.

This modified judgment provided that the defendants would make restitution to all of Bestline's direct distributors in California (which the parties anticipated would amount to approximately $12 million) and to direct distributors elsewhere who obtained judgments through private lawsuits or were the beneficiaries of judgments obtained against Bestline by state attorneys general proceeding *parens patriae*.[31] Although the California attorney general was under no obligation to provide a remedy to non-Californian distributors, the restitutionary provisions were expanded to include outside distributors in the hope that they would seek satisfaction under the provisions of the modified judgment and forego execution on their judgments, thus avoiding, perhaps, the depletion of Bestline's assets and possible bankruptcy proceedings.

The superior court, in its modified judgment, appointed Sylva [32] "Compliance Officer," to act as an ombudsman or special master charged with the duty of approving direct distributor claims and monitoring the Bestline defendants' compliance with the court's judgment. The court also created in the Bank of America an irrevocable trust fund, the California Fund, to which Bestline would forward its restitution payments and from which the distributors would be paid, at Sylva's direction. The court required Bestline to make an initial payment of $3,980,000 [33] and thereafter semiannual payments until all eligible distributors received full restitution. The first semiannual payment, $250,000, was to be made on January 1, 1976.[34] If Bestline failed to

---

**30.** Bestline sought reorganization under the Bankruptcy Act of 1898.

**31.** The judgment also provided that a direct distributor who received an arbitration award pursuant to a national plan of arbitration or whose claim Bestline approved was also entitled to participate. The first group, arbitration award recipients, never materialized because a national plan of arbitration was never adopted. As for the second group, the record does not indicate how many distributors became eligible to participate because Bestline approved their claims. The number, if any, however, would not affect the issues before us here.

**32.** *See supra* note 4.

**33.** It appears that Bestline actually transferred $4,085,936.61 to the California Fund. We are unable to ascertain the cause of this discrepancy.

**34.** The remaining payments by Bestline to the California Fund were scheduled as follows:

June 30, 1976 ......... 500,000, or 50% of pre-tax profits whichever is greater.
January 1, 1977 ...... 500,000

June 30, 1977 ......... 750,000, or 50% of pre-tax profits whichever is greater.
January 1, 1978 ...... 750,000

make two consecutive semiannual payments, the California attorney general could petition the superior court to terminate the California Fund and appoint a receiver to liquidate Bestline's California assets. The eligible distributors were to begin receiving restitution on January 1, 1975, after Bestline made its initial payment, and thereafter semiannually until full restitution was made.[35]

On January 4, 1974, Bailey, who remained secondarily liable under the modified judgment for Bestline's restitutionary obligations and who was liable for $250,000 in civil penalties, entered into a settlement with the State of California under which the State agreed to accept from Bailey $750,000 in full accord and satisfaction of his contingent liability for restitution and $250,000 for his liability for the civil penalties. Under this settlement, Bailey made no admission of liability[36] and retained the right to question the superior court's adjudication of liability on appeal.

The defendants thereafter appealed, challenging the superior court's determination that Bestline's practices were in violation of state law; they did not attack the remedial provisions of the court's modified judgment. The court of appeals affirmed the superior court's determination on all issues. *People v. Bestline Products, Inc.*, 61 Cal. App.3d 879, 132 Cal.Rptr. 767 (1976).

Following the implementation of the California Judgment, the attorneys general of Missouri, Ohio, Pennsylvania, New Jersey, Texas, and Wisconsin and the New York City Bureau of Consumer Protection brought similar *parens patriae* suits on behalf of Bestline direct distributors and obtained money judgments. All the beneficiaries of these judgments elected to seek restitution through the California Fund.

2.

On July 20, 1973, five days before the Los Angeles County Superior Court entered its original judgment against Bestline and Bailey, attorney Carl H. Hoffman filed this class action in the U.S. District Court for the Southern District of Florida against Bestline, Bailey, and another Bestline officer,[37] alleging that the sale of Bestline's distributorships violated both the Securities Act of 1933 (the Securities Act of 1933), 15 U.S.C. § 77a et seq. (1982), and the Securities Exchange Act of 1934 (the Exchange Act of 1934), 15 U.S.C. § 78a et seq. (1982), and seeking money damages. The district court, on being advised that the bankruptcy court for the Northern District of California had stayed all judicial proceedings against Bestline, dismissed the complaint without prejudice. On September 27, 1973, after the stay order was lifted, the district court vacated its dismissal order and reinstated this suit. The Judicial Panel on

June 30, 1978 . . . . . . . . 1,000,000, or 50% of pre-tax
and on or before profits whichever is greater.
each June 30 of
each successive
year.

January 1, 1979 . . . . . . 1,000,000
and on or before
each January of
each successive
year.

**35.** The remaining payments from the California Fund were scheduled as follows:

January 1, 1975 . . . . . . 1,000,000

June 30, 1975 . . . . . . . . 1,000,000

January 1, 1976 . . . . . . 250,000

June 30, 1976 . . . . . . . . 500,000, or 50% of pre-tax
 profits whichever is greater.

January 1, 1977 . . . . . . 500,000

June 30, 1977 . . . . . . . . 750,000, or 50% of pre-tax
 profits whichever is greater.
January 1, 1978 . . . . . . 750,000

June 30, 1978 . . . . . . . . 1,000,000, or 50% of pre-tax
and on or before profits whichever is greater.
each June 30 of
each successive
year.

January 1, 1979 . . . . . . 1,000,000
and on or before
January 1 of
each successive
year.

**36.** *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 400, 97 S.Ct. 2464, 2473, 53 L.Ed.2d 423 (1977) (ordinarily settlement of the issue of liability renders the case or controversy moot).

**37.** This person was David L. Eastis, then presi-

Multi-District Litigation subsequently consolidated, for discovery purposes, this case with several other private lawsuits pending against Bestline,[38] and on October 3, 1974, the district court designated Carl H. Hoffman and James H. Joseph (who previously had made an appearance for the plaintiffs in the instant case, as Hoffman's co-counsel) lead counsel for the plaintiffs in the consolidated cases.

On November 12, 1974, Lead Counsel amended the complaint in the instant case to add two pendent state law claims: first, that Bestline's direct distributorships were unconscionable contracts in violation of section 2–302 of the Uniform Commercial Code; second, that the manner in which Bestline's direct distributorships were sold amounted to common law fraud and deceit.[39] The amended complaint also added as parties defendant numerous other officers, directors, or shareholders of Bestline.

On November 22, 1974, the district court ordered this case to proceed as a class action, but only as to the plaintiffs' claims under the federal securities laws. It certified as a class those persons, numbering about 40,000, who had invested in direct distributorships and had never become general distributors.[40] Many who were receiving restitution from the California Fund were, by definition, members of the plaintiff-class;[41] they comprise, for our purposes, the Minority Group. Conversely, all the members of the plaintiff-class who were not then participants in the California Fund, i.e., the Majority Group, would become eligible to receive payments from the Fund if they recovered a money judgment in this case.

Prior to the time the district court certified the plaintiff-class, Lead Counsel knew that the Minority Group, whom they were representing, were receiving restitution payments from Bestline through the California Fund. Lead Counsel also knew that, if Bestline made full restitution under the California Judgment, it would have few, if any, resources to satisfy a judgment, and pay an attorney's fee, in this case. In short, Lead Counsel knew that, if they were to obtain a recovery, they would have to stop the flow of money from Bestline to the California Fund; they would have to litigate against their own clients, the Minority Group. Lead Counsel chose to do so indirectly, through Sylva.

Lead Counsel's litigation against Sylva, and thus against the Minority Group, has taken place in five forums—the Los Angeles County Superior Court, the U.S. District Court for the Northern District of California, the Ninth Circuit, the court below, and this court—and it has spanned nine years. This litigation began on September 20, 1974, when Lead Counsel, purportedly acting on behalf of the plaintiff-class, wrote a letter to the Bank of America, which held

dent of Bestline.

**38.** [T]he Judicial Panel on Multidistrict Litigation transferred six cases to the Southern District of Florida for consolidation with the [instant] case.... *In re Bestline Products Securities and Antitrust Litigation,* 375 F.Supp. 926 (Jud.Pan.Mult.Lit.1974). Later, it transferred four Texas cases to the Florida court, 405 F.Supp. 313 (Jud.Pan.Mult.Lit.1975), as well as one North Carolina case. Most of these cases were class actions and alleged violations of the federal securities laws and various state laws.
*Piambino I,* 610 F.2d at 1308 n. 3.

**39.** In their amendment to their complaint, Lead Counsel did not indicate which state law governed their pendent claims under the Uniform Commercial Code and the tort law of fraud and deceit.

**40.** In addition, direct distributors who had reordered products from Bestline after May 22, 1977 were excluded from the class on the assumption that such persons would have an interest in Bestline's survival and thereby be in conflict with inactive distributors. General distributors were excluded from the class for the same reason.

**41.** Although it does not appear that *all* of the members of the California Fund were also eligible for membership in the plaintiff-class, for the provisions of the California Judgment also provided for the inclusion of non-direct distributors, the parties and the *Piambino I* panel appear to have presumed this to be the case. Whether this presumption is true would not alter our decision here, and we will henceforth treat the California Fund as if it included only direct distributors.

**1130**

the California Fund, demanding that the bank cease drawing restitution checks on the Fund payable to the claimants Sylva had been designating. These claimants of course included the members of the Minority Group. Counsel advised the bank that their clients who had not been receiving restitution payments, i.e., the Majority Group, had a "prior equity" in the monies on deposit in the California Fund, because these monies were "directly traceable to money paid into Bestline by [the plaintiff-class] pursuant to a pyramid franchising scheme," and that the California Fund was subject to a constructive trust in their favor. Thus, the bank would be liable to Lead Counsel's clients in the Majority Group for their proportionate share of the monies in the California Fund. Lead Counsel sent a follow-up letter on October 8, 1974, warning the bank that, if it continued issuing restitution checks, they would sue the bank for an injunction and for their clients' share of the restitution payments previously made.

Disturbed by Lead Counsel's letters, the Bank of America petitioned the Los Angeles County Superior Court for instructions as to its duties under the California Judgment. The court held a hearing on the petition. Lead Counsel appeared and argued that the Bestline distributors comprising the Majority Group were entitled to *all* of the monies in the California Fund, despite the fact that those distributors had not recovered a judgment against Bestline and thus were not entitled to participate in the restitution program established by the superior court's judgment. They requested the court to enjoin Sylva and the bank from making any further distributions from the California Fund and to impose a constructive trust on the Fund, solely for the benefit of their clients in the Majority Group. The superior court summarily rejected

Lead Counsel's request and instructed the bank to continue disbursing the monies as required by the California Judgment.

Having failed in the Los Angeles County Superior Court, Lead Counsel turned to the federal court in San Francisco for relief. On November 15, 1974, the day after the superior court's ruling, Lead Counsel, acting in behalf of the entire plaintiff-class, filed suit in the U.S. District Court for the Northern District of California against Sylva, the Bank of America, the Los Angeles County Superior Court, the California attorney general, and Bestline. Lead Counsel sought essentially the same relief they had sought in state court, an injunction prohibiting Sylva and the Bank of America from making any further distributions from the California Fund and the imposition of a constructive trust for the benefit of the Majority Group. They alleged that the defendants were violating 42 U.S.C. § 1983 (1982) [42] by enforcing, in behalf of the State of California, a judgment that denied the Majority Group the equal protection of the laws and due process of law under the ninth and fourteenth amendments.

In an amendment to their complaint, Lead Counsel presented two additional claims for relief. First, they alleged that Bestline's practices in selling its direct distributorships to the plaintiff-class violated the Securities Act of 1933 and the Exchange Act of 1934 and that the Bank of America had aided and abetted Bestline in these violations. Second, they alleged that the means by which Bestline marketed its distributorships amounted to common law fraud and deceit and that the Bank of America had participated in such fraud and deceit. These federal securities laws and fraud and deceit claims were "virtually identical" [43] to the claims Lead Counsel

**42.** 42 U.S.C. § 1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immuni-

ties secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

**43.** Lead Counsel made the statement in their amendment to their complaint that the federal securities laws and fraud and deceit claims they

were, and are, prosecuting in the instant case. Lead Counsel also sought the same sort of relief they were seeking in this case: restitution, any consequential damages the plaintiff-class may have incurred, and punitive damages.

The defendants, severally, moved to dismiss the complaint, as amended, for failure to state a claim for relief. *See* Fed.R. Civ.P. 12(b). On March 28, 1975, the district court convened a hearing on the defendants' motions to dismiss. Lead Counsel failed to attend the hearing. On April 4, 1975, the district court, noting that the plaintiffs had filed nothing in opposition to the defendants' motions, granted these motions and dismissed plaintiffs' amended complaint with prejudice. Lead Counsel appealed this dismissal to the Ninth Circuit Court of Appeals but abandoned their appeal before the court could take it under submission. The Ninth Circuit accordingly dismissed the appeal, without opinion, on February 24, 1976.

■ On May 19, 1975, while their appeal to the Ninth Circuit was pending, Lead Counsel moved the district court below to declare, on partial summary judgment, that, for purposes of their claims under the federal securities laws, Bestline's direct distributorships were "securities." Neither Lead Counsel nor the attorneys for Bestline advised the court that only a month earlier the U.S. District Court for the Northern District of California had dis-

missed with prejudice a class-action suit Lead Counsel had brought in behalf of the plaintiff-class against Bestline (and others) containing the same federal securities laws claims.[44] On March 19, 1976, a few days after the Ninth Circuit dismissed Lead Counsel's appeal from the dismissal of the California class action, the district court granted Lead Counsel's motion,[45] declaring that the direct distributorships the plaintiffs had purchased from Bestline constituted securities.

■ At this point, Lead Counsel attempted, once again, to freeze Bestline's assets in the hope that there would be funds available to satisfy their clients' claims, to pay an attorney's fee and to reimburse them for the litigation expenses they had advanced, which were mounting. On March 23, 1976, they moved the court below to place in receivership Bestline and its two founding principals, Bailey and Brassfield. Their chances of prevailing on such a motion were, they no doubt knew, very slim, since precedent of long standing was squarely against them. This precedent holds that the receivership remedy they sought is available only to plaintiffs with an equitable interest in the property to be seized or with judgments that cannot otherwise be satisfied.[46] Such a receivership is not available to plaintiffs, such as those Lead Counsel were representing, who are merely prosecuting a tort action for the

alleged were "virtually identical" to those in this case.

**44.** A lawyer is subject to discipline for failing to apprise a court of controlling authority that is directly adverse to his position and which is not disclosed by opposing counsel. ABA Model Code of Professional Responsibility DR 7-106(B)(1); ABA Model Rules of Professional Conduct Rule 3.3(a)(3); Florida Code of Professional Responsibility DR 7-106(B)(1) (1984). Lead Counsel's failure to apprise the district court of the dismissal, on the merits, of these "virtually identical" claims in the Northern District of California, *see supra* text at 1130-1131, or the Ninth Circuit's later dismissal of their appeal from that disposition, *see supra* text at 1131, would appear to subject Lead Counsel to disciplinary proceedings under the above-cited authority.

**45.** The court was apparently unaware of the Ninth Circuit's ruling.

**46.** For a general discussion on the propriety of the appointment of a receiver, *see* 12 C. Wright & A. Miller, *Federal Practice and Procedure,* §§ 2981–86 (1973). As a general rule, receivers may only be appointed when the party seeking receivership has some "legally recognized right in [the] property [he wishes to seize] that amounts to more than a mere claim against defendant." *Id.,* § 2983, at 17. A judgment creditor may only proceed in equity for the appointment of a receiver after he has exhausted his legal remedies, i.e., he has attempted to execute on his judgment but it remains unsatisfied. *Pusey & Jones Co. v. Hanssen,* 261 U.S. 491, 497, 43 S.Ct. 454, 455–56, 67 L.Ed. 763 (1923).

recovery of unliquidated money damages and have not reduced their claims to judgment. Bestline, Bailey, and Brassfield strenuously objected to the appointment of a receiver, citing this precedent, and the California attorney general, appearing *amicus curiae*, joined in their objection. The attorney general also advised the court that Lead Counsel had previously been unsuccessful in their attempts to obtain essentially the same relief in state and federal courts in California. He stressed the point that, if the court appointed a receiver, the California Fund would collapse and thousands of California and non-California distributors, who had foregone the chance to execute on their judgments, would be denied the restitution to which they had become entitled by the force of judgments the district court should accord full faith and credit. The district court declined to place the three defendants in receivership,[47] thus leaving Lead Counsel still empty handed.

Lead Counsel did not tarry long in launching a new plan to solve their financial problems; on April 1, 1976, they joined the Bank of America as a party defendant to the class action. They alleged, as they had in the Northern District of California, that the Bank had aided and abetted Bestline's violation of the federal securities laws. Lead Counsel's plan had little chance of success for two quite obvious reasons. First, the Southern District of Florida was an inappropriate venue for the plaintiffs' claims against it.[48] Second, should the district court conclude that its venue was proper, the bank, in its answer, would plead res judicata, contending that the judgment it had obtained against the plaintiffs in the Northern District of California, in a suit involving the identical claims Lead Counsel were presenting against it in the instant case, operated as a bar. The bank promptly moved the district court to dismiss it as a party defendant for want of proper venue, and, following the Supreme Court's then recent holding in *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976), the district court granted the bank's motion.

Shortly after Lead Counsel brought the Bank of America into this litigation, and while the bank's motion for dismissal was pending, they discovered another possible source of revenue, a suit the United States was prosecuting against William E. Bailey, under 15 U.S.C. § 45(*l*) (1982),[49] in the U.S. District Court for the Northern District of California. On April 2, 1976, that court had found Bailey liable to the United States for violating the terms of the cease and desist order[50] Bailey and Bestline had con-

47. The court also declined to act on Lead Counsel's "Ancillary Complaint for Creditor's Bill," the pendent state law counterpart to their petition for receivership.

48. 12 U.S.C. § 94 (1976) provided that
[a]ctions and proceedings against [a national bank] under this chapter may be had in any district or Territorial court of the United States held within the district in which such [bank] may be established, or in any State, county, or municipal court in the county or city in which said [bank] is located having jurisdiction in similar cases.
The Bank of America was not present in the Southern District of Florida within the meaning of this statute.

49. 15 U.S.C. § 45(*l*) provides:
(1) Penalty for violation of order; injunctions and other appropriate equitable relief
Any person, partnership, or corporation who violates an order of the [FTC] after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in a case of a violation through continuing failure to obey or neglect to obey a final order of the [FTC], each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the [FTC].

50. 15 U.S.C. § 45(*l*) provides that, if any person violates a cease and desist order of the FTC, he may be assessed penalties in a civil action brought by the Attorney General.

sented to with the FTC in 1971, *see supra* text at 1125, and scheduled an evidentiary hearing on May 28, 1976 to determine the amount of the civil penalties Bailey would have to pay the government for those violations. *United States v. Bestline Products Corporation*, 412 F.Supp. 754 (N.D.Cal. 1976). Bailey's exposure was substantial, at $10,000 for each violation,[51] and Bailey anticipated that a substantial judgment would be entered against him. He was also concerned about his exposure in the instant case.

At this point, Bailey conceived a plan to cut his losses; he would buy his way out of two lawsuits for the price of one. He knew the plan would appeal to Lead Counsel because, if it succeeded, it would give them funds to defray their litigation expenses and perhaps provide them with an attorney's fee. It did not take long for Bailey and Lead Counsel to strike a bargain. They agreed that the plaintiff-class would settle their claims against Bailey for $750,-000, less the amount of the penalties the U.S. District Court for the Northern District of California assessed in favor of the United States; provided that, if these penalties exceeded $750,000, the settlement would be null and void. Under this arrangement, if the district court in California assessed Bailey's penalties at $750,000, that sum would be deducted from the $750,000 settlement here and the plaintiff-class would receive nothing. If, however, the penalties amounted, for example, to $600,000, the plaintiff-class would receive $150,000, less Lead Counsel's expenses (set by them at $50,000) and a reasonable attor-

ney's fee. Bailey and Lead Counsel also agreed that any member of the plaintiff-class who had participated in the California Fund, i.e., the Minority Group, would receive *none* of the settlement proceeds. They reasoned that the Minority Group had already obtained an adequate recovery from Bailey out of the $750,000 settlement he had made with the California attorney general on January 4, 1974. *See supra* text at 1128.

Lead Counsel and Bailey immediately presented their settlement to the court below for preliminary approval, and the court approved it on June 8, 1976. Eight days later, however, the settlement, by its own terms, became null and void when the district court in California ordered Bailey to pay the United States $1,036,000 in civil penalties.[52]

With this adverse turn of events, Lead Counsel renewed their efforts to tie up Bestline's assets and to obtain some quick cash, once again at the expense of the Minority Group. As we have related in Part I.A., *supra*, in mid-June 1976, Bestline was preparing to make a $500,000 payment to the California Fund; the payment was due on June 30. On June 18, Lead Counsel moved the district court for a temporary restraining order pursuant to Fed.R.Civ.P. 65(b),[53] contending, as they had in the California state and federal courts, that the California Fund, in disbursing Bestline's restitution payments to the Minority Group, was discriminating against the Majority Group in violation of their fourteenth amendment equal protection and due pro-

---

**51.** 15 U.S.C. § 45(*l*) provides in pertinent part that
[a] civil penalty of not more than $10,000 for each violation ... shall accrue to the United States ... [with each day of a] . continuing failure to obey or neglect to obey a final order of the [FTC] ... deemed a separate offense....

**52.** This order is unpublished.

**53.** Fed.R.Civ.P. 65(b) provides in pertinent part:
(b) **Temporary Restraining Order; Notice; Hearing; Duration.** A temporary restraining

order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required.

cess rights.[54] On June 30, the court convened a hearing on the motion. Bestline and the California attorney general appeared and strenuously opposed the motion. The attorney general argued that the plaintiffs' fourteenth amendment claims had already been decided adversely to the plaintiffs in the U.S. District Court for the Northern District of California and were therefore barred.

The district court ruled from the bench. Rejecting the attorney general's res judicata/collateral estoppel argument, it considered Lead Counsel's motion for a temporary restraining order as an application for a preliminary injunction in aid of the court's jurisdiction and granted it. The court directed Bestline to deposit the June 30 payment to the California Fund in the registry of the court and enjoined it from making any further payments to the Fund. It announced that, unless it took such action, Bestline would have no resources with which to satisfy any judgment the plaintiffs might eventually receive in this case.[55]

After the court announced its ruling, Bestline complained that the court had failed to require the plaintiffs to post a bond, as mandated by Fed.R.Civ.P. 65(c). The court acknowledged this failure and stated that the $500,000 Bestline would be depositing into the registry of the court would serve as such a bond. On July 7, the court memorialized its preliminary injunc-

tion with a written order. On August 6, Bestline appealed that order to this court.[56]

Meanwhile, Lead Counsel and Bailey resumed settlement negotiations. The U.S. District Court for the Northern District of California had amended its judgment against Bailey to provide that Bailey could deduct from the $1,036,000 in civil penalties he owed the United States any amount that he might pay to the plaintiff-class in this case.[57] This amendment gave Bailey strong incentive to settle with the plaintiff-class, and they promptly reached an agreement. Bailey would pay the plaintiff-class $1,036,000 for a release of all of their claims against him. As the first settlement agreement Bailey negotiated with Lead Counsel provided, this amount would be distributed only to the members of the Majority Group; those in the Minority Group would not participate. The agreement also provided that Lead Counsel would receive a $250,000 attorney's fee, and litigation expenses, from the settlement proceeds.

The district court preliminarily approved this second Bailey settlement on October 10, 1976. On December 17, 1976, the plaintiff-class, including the Minority Group, received notice of the proposed settlement. The notice included proof of claim forms. Anyone who wished to participate in the settlement was required to complete and return a form. The notice stated that the members of the Minority Group were not

---

**54.** Lead Counsel's conduct in urging the district court to grant the temporary restraining order on these fourteenth amendment grounds was, arguably, unethical. *See supra* note 44. The U.S. District Court for the Northern District of California had expressly rejected these precise grounds, and the Ninth Circuit had dismissed Lead Counsel's appeal from that disposition, in a similar factual context. *See supra* text at 1130–1131.

**55.** The district court's injunction was the equivalent of an attachment before judgment in a statutory tort suit for unliquidated money damages. No authority has been cited in support of such a remedy in a case such as this.

**56.** In its notice of appeal, Bestline also sought review of the district court's summary judgment determination that its distributorships constitut-

ed securities. This partial summary judgment was interlocutory in nature and thus not appealable, *see* 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2715 (2d ed. 1983), unless the district court certified that the disposition involved "a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the [summary judgment] order may materially enhance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b) (1982). The district court denied Bestline's application for a certificate on June 30, 1976, when it issued the preliminary injunction. Although we are uncertain how the *Piambino I* panel reviewed the summary judgment without a § 1292(b) certification, this issue is not now before this court.

**57.** This order is unpublished.

eligible to participate in the settlement; consequently, most of the members of that Group, approximately five-sevenths, did not return proof of claim forms.

After the period for submitting claim forms expired, the district court convened a hearing to pass on Lead Counsel's application for final approval of the settlement. The Department of Justice had, apparently, decided to acquiese in Bailey's use of $1,036,000 in government funds (the $1,036,000 he owed the United States in civil penalties) to obtain a release of the plaintiff's claims against him,[58] but it objected to the use of any of government funds to pay Lead Counsel an attorney's fee. An attorney from the Department therefore appeared to protest the fee award Lead Counsel and Bailey's lawyers had negotiated. He argued that Lead Counsel were not entitled to a fee because they had done nothing to generate the settlement proceeds; rather, those proceeds had been created solely through the efforts of government counsel in prosecuting the suit for civil penalties against Bailey in the Northern District of California. The district court, questioning whether the Department of Justice had a right to appear and protest, found that Lead Counsel had made a "substantial contribution"[59] to the acquisition of the settlement funds and approved the $250,000 attorney's fee and the other terms of the settlement. On February 15, 1977, it entered a final judgment incorporating the settlement and disposing of the plaintiffs' case against Bailey. At the same time, the court instructed Bailey to apply to the U.S. District Court for the Northern District of California for an order transferring the $1,036,000 Bailey had previously deposited in that court's registry to the registry of the U.S. District Court for the Southern District of Florida. Bailey followed this instruction and the funds were transferred.

With the Bailey settlement in hand, Lead Counsel negotiated a settlement with Bestline and the remaining twenty-seven individual defendants. Once again, the negotiators preferred the Majority Group at the expense of the Minority Group. Unlike the Bailey settlement, however, the Bestline settlement did not, by its terms, totally shut out the Minority Group.

The Bestline settlement provided that (1) the defendants, collectively, would pay the plaintiff-class $900,000 in cash, (2) Bestline would give the plaintiffs a promissory note for $300,000, guaranteed by Jerry Brassfield, (3) Bestline would liquidate all of its assets and pay the proceeds to the plaintiff-class, (4) Bestline would dismiss its appeal from the district court's June 30, 1970 preliminary injunction and relinquish whatever claim it had to the $500,000 it had deposited in the court's registry on that date to serve, as the court had ordered, as a Fed.R. Civ.P. 65(c) bond, and (5) Lead Counsel would receive out of the settlement proceeds a $750,000 attorney's fee and up to $50,000 in litigation expenses.

The means Lead Counsel used to prefer the participation of the Majority Group over the Minority Group in the settlement was the notice of settlement they sent to the members of the plaintiff-class. The notice went only to those who had returned proof of claim forms in connection with the Bailey settlement. As we have noted, only two-sevenths of the Minority Group returned proof of claim forms. The Group had been advised, in the notice of the Bailey settlement, that they were to receive nothing from Bailey, and consequently they had no incentive to submit a proof of claim. To do so would have been a useless act. Moreover, they could not have known that, by failing to submit a claim form with respect to the Bailey settlement, they would foreclose their right to participate in

---

**58.** The record does not contain an explicit indication that the Department of Justice decided to acquiesce in Bailey's use of these government funds to settle the instant case. We draw the assumption that it decided to acquiesce from its argument in the court below that Lead Counsel

should not be awarded an attorney's fee from those funds.

**59.** The district court did not explain precisely what Lead Counsel's "substantial contribution" was.

a subsequent Bestline settlement. Thus, because only two-sevenths of the Minority Group received notice of the Bestline settlement, only two-sevenths returned proof of claim forms [60] and, thus, only two-sevenths became eligible to share in the proceeds thereof.

By the time the notice of the Bestline settlement had been circulated, it had become apparent to Sylva, as the Compliance Officer under the California Judgment, that the interests of the Minority Group had been completely forsaken. Lead Counsel, ostensibly representing that Group, had succeeded in cutting most of them out of the case. In addition, Bestline, which had been telling Sylva that it was vigorously pursuing its appeal from the district court's June 30, 1976 preliminary injunction, had all but abandoned it.[61] On February 14, 1977, seventeen days after Lead Counsel filed the proposed Bestline settlement with the district court, Sylva moved the district court to intervene, as a party plaintiff representing the Minority Group.

As we have stated in Part I.A., *supra,* Sylva presented two reasons for intervening: first, to obtain the dissolution of the preliminary injunction so that Bestline could resume its restitution payments to the California Fund; second, to protect the interests of the Minority Group in the instant case. He asked the court to create a plaintiff-subclass, comprised of the plaintiffs in the Minority Group, and to designate him as the representative of that subclass.

The district court took Sylva's motion under advisement. On March 11, 1977, at the hearing it convened to consider Lead Counsel's application for the final approval of the Bestline settlement, the court recognized Sylva's appearance for the limited purpose of voicing any objections he might have to the settlement. Sylva protested that the settlement amount was too small and that the attorney's fee was too large. He also urged the court to send a new notice of settlement to the members of the Minority Group so that they would have an opportunity to participate.

On March 22, 1977, the court entered an order denying Sylva's motion to intervene, approving the settlement, and awarding Lead Counsel the attorney's fee they had negotiated. The court did not explain why it denied Sylva intervention, except to say that his motion to intervene was both untimely and meritless. Turning to the settlement, the court concluded that it was the result of arms-length negotiations, that its terms were fair, reasonable, and adequate and that the notice of settlement (that had been sent only to the members of the plaintiff-class who had returned proof of claim forms with respect to the Bailey settlement) was "the best practicable under the circumstances." The court further found that the proposed attorney's fee was reasonable because "the award and amount of attorneys fees [came] before this court in the posture of an unopposed settlement." The court observed that the only one who had objected either to the terms of the settlement or the amount of the attorney's fee was Sylva, but he was not a party to the litigation.

On March 25, 1977, three days after the court approved the Bestline settlement, Lead Counsel withdrew from the court's registry the $1,000,000 in attorney's fees they had received for the two settlements. On April 1, 1977, Sylva moved the court to set aside the disbursement of those fees and to stay the execution of the final judgment [62] entered pursuant to the Bestline

---

**60.** Actually, some of the two-sevenths who received notice of the Bestline settlement neglected to return proof of claim forms. Less than two-sevenths therefore became eligible to share in the proceeds thereof.

**61.** *Piambino I* describes in considerable detail the manner in which Bestline lulled Sylva into believing that it was vigorously pursuing its appeal. 610 F.2d at 1325–26 & n. 23.

**62.** Actually, Sylva, not being a party to the proceedings, lacked standing to move the court to set aside the fee disbursement and to stay the execution of the final judgment. As a nonparty, what Sylva was actually seeking was an injunction, an in personam order directing Lead Counsel to restore their attorney's fee and reimbursed expenses to the registry of the court and, with respect to the settlement, directing the par-

settlement. The same day, the court, without a hearing, summarily denied Sylva's motion, and Sylva appealed. Thereafter, the clerk of the court disbursed the settlement funds to the members of the plaintiff-class who submitted proof of claim forms; the disbursement was completed by the time *Piambino I* was argued to this court. On December 5, 1980, we decided *Piambino I*, the consolidated appeals from the district court's June 30, 1976 injunction and its March 22, 1977 order denying Sylva's motion to intervene.

We have outlined the *Piambino I* panel's holdings, *see supra* text at 1119, and the strategy Lead Counsel, and the defendants who joined in the Bestline settlement, employed in the district court to circumvent those holdings. *See supra* text at 1118. Lead Counsel now acknowledge, as they must, that the panel, in unambiguous language, struck down their Bestline settlement and attorney's fee award as manifestly unfair; they contend, however, that the panel did not take the next step and provide for the disposition of the settlement proceeds and their fee.

Lead Counsel and the settling defendants have spent the monies they have received and, we have been told, they cannot pay them back. The settling defendants do not want the money.[63] As they announced at the close of oral argument, all they desire is an end to this litigation. Lead Counsel therefore submit that, even if we should conclude that *Piambino I* calls for the return of the money to the district court's registry, we should invoke the third exception to the law of the case doctrine, which permits a trial court to avoid a previous appellate decision if adherence to that decision would be clearly erroneous and manifestly unjust, and affirm the district court.

As we indicate in Subpart 3 that follows, Lead Counsel's argument must be rejected on all points.

3.

We have no difficulty in concluding that the *Piambino I* panel properly intended that the monies disbursed in connection with the Bestline settlement be restored to the registry of the district court. We are also confident that requiring such restoration will not work a manifest injustice in this case. We draw these conclusions for two reasons. First, the panel intended to assuage the prejudicial effects Lead Counsel's conflict of interest and the district court's erroneous rulings had on the Minority Group. This intent permeates its opinion. Second, the panel intended to vindicate the prophylatic measures of the class-action rule, Fed.R.Civ.P. 23, that should have prevented the Bestline settlement from taking place.

The panel observed at the outset that there would have been no settlement at all had Lead Counsel not persuaded the district court to enjoin Bestline from making further restitution payments to the California Fund. Such an injunction was plainly unlawful, barred by the Anti-Injunction Act, 28 U.S.C. § 2283 (1982).[64] Lead Counsel urged the panel to uphold it, but, as the panel observed, their arguments were frivolous. *Piambino I*, 610 F.2d at 1330–34. The panel saw the injunction for what it was, a device conceived by Lead Counsel to generate funds for litigation expenses and attorneys' fees.

This device, however, destroyed the right of 7,043 Bestline distributors to obtain restitution from the California Fund. 2,300 of these distributors were from California; they were the initial beneficiaries of the

---

ties to take no steps toward its execution. In our view, the district court, having denied Sylva intervention, had to deny his application for such injunctive relief.

**63.** These defendants apparently have concluded that the settlement they made with Lead Counsel is worth more to them than a return of the settlement proceeds they provided and a potential judgment of no liability.

**64.** 28 U.S.C. § 2283 provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

See *Piambino I*, 610 F.2d at 1330–34.

California Judgment. The rest were from other states; they had withheld executing on their judgments and had turned to the California Fund in an effort to keep Bestline out of the bankruptcy courts and to achieve full restitution. The claims of these 7,043 distributors, which averaged over $3,000 apiece, totalled more than $21 million. As the panel noted, "[a]pproximately $4.5 million had been distributed to these persons before the District Judge issued his preliminary injunction halting further payments from Bestline to the [California Fund]," *id.* at 1329, and, had his injunction not issued, an additional $4.5 million would have been distributed. *Id.* In fact, Bestline would have satisfied in full its obligations under the California Judgment.[65] *Id.* at 1330.

The panel thus concluded that Lead Counsel's class action had "generated no common fund from which to pay [a settlement and] attorneys' fees and expenses," *id.*, and that the district court, in assessing the merits of the settlement, "erred by not making the [Minority G]roup whole out of the settlement proceeds, or at least according them an absolute priority to all such funds." *Id.* If any doubts existed as to who should have first call on those funds—Lead Counsel and the Majority Group or the Minority Group—the panel removed them when it summarized the result of its decision:

> Thus, the result which we reach, by assuming that the 7,043 California [F]und participants were properly included in the class as defined by the District Court, is the same as that which would have been reached if those persons had not been included in the class and if the preliminary injunction had not issued. By concluding that those persons are entitled to settlement proceeds up to $4,500,000 plus interest, they are placed in the same position they would have been in if Bestline had made all the

scheduled payments to the [California Fund].

*Id.*

The panel knew, of course, that the district court, in implementing its decision, could not order Lead Counsel and their clients to pay the monies they had received to the California Fund, the remedy Sylva reads into the panel's decision. Such an order is not explicit in the panel's mandate and in our view cannot be implied. In vacating the settlement and attorney's fee award and dissolving the injunction, the panel restored the litigation to the legal posture it occupied prior to the entry of the injunction and, also, the settlement. Bestline therefore would be free to complete the restitution required by the California Judgment.

Bestline had been liquidated, however, and the proceeds of the liquidation had been disbursed pursuant to the settlement; this fact had been made known to the panel. Consequently, the only Bestline funds available to Sylva, both as Compliance Officer of the California Judgment and as the representative of the Minority Group prosecuting the claims in this case, were those in the hands of Lead Counsel and the settling plaintiffs. Sylva had two methods of pursuing them. He could bring suit against Lead Counsel and these plaintiffs, individually, in whatever jurisdiction they might be located, or he could petition the district court to order them to return the monies they had received to the court's registry. Neither method, of course, could restore Sylva and the Minority Group to the identical position they had occupied prior to the entry of the injunction, since Bestline had been liquidated.

▮▮▮▮ Of the two methods available to Sylva, the second would come the closest to restoring him and the Minority Group to their pre-injunction position. If the monies were restored to the registry of the district court, Sylva, as Compliance Officer, could levy upon them, at least those derived from

---

**65.** The *Piambino I* panel concluded that "long before" the Bestline settlement Bestline would have either satisfied the California Judgment or

the Minority Group would "have obtained Bestline's assets through liquidation." 610 F.2d at 1330.

Bestline as opposed to the individual defendants, to satisfy the California Judgment.[66] And, as the Minority Group's representative in this case, he could also use the funds as a basis for negotiating a new settlement or, failing that, to satisfy any judgment the plaintiffs might obtain from Bestline and its promoters. The first method would, as a practical matter, be worthless, except perhaps in the case of Lead Counsel. To pursue the individual plaintiffs in their own forums for the relatively small amounts they received would be unduly expensive and probably not worth the effort. We are convinced that the panel could not have intended such a result. Rather, it contemplated the restoration of the funds to the court's registry.[67]

The panel no doubt would have expressed this view had Lead Counsel informed it in oral argument, or later in their petition for rehearing, that they intended to preserve their settlement and, notwithstanding the panel's decision, would resist any effort to make them, or their clients, return the proceeds thereof to the district court's registry. Moreover, the panel would have included among its explicit holdings the instruction that the district court forthwith order Lead Counsel and the plaintiffs who had participated in the settlement to deposit the funds they had received, with interest, in the court's registry. Finally, the panel would have instructed the district court to determine whether Lead Counsel's financial stake in the case was such that Lead Counsel could no longer represent the interests of the Majority Group. We make this determination, ourselves, in Subpart C below.

The *Piambino I* panel expressed great concern about the district judge's fidelity to Rule 23 in approving the settlement of this class action. Rule 23 class actions accomplish many salutary goals; at the same time, they can cause great mischief. In both instances, the legal profession, judges and lawyers alike, are responsible for the result. The lawyers who bring these cases have a heavy fiduciary responsibility to their clients—especially those who are absent and those in the minority whose interests are at odds with the named plaintiffs and their group—to the trial judge and to the people, who provide the forums and governmental resources for these suits. Invariably, the plaintiffs' lawyers must look to the defendants for their fees and litigation expenses; invariably, they settle. Because of the potential for a collusive settlement, a sellout of a highly meritorious claim, or a settlement that ignores the interests of minority class members, the district judge has a heavy duty to ensure that any settlement is "fair, reasonable, and adequate" and that the fee awarded plaintiffs' counsel is entirely appropriate.[68]

66. The *Piambino I* panel made it clear that the California Judgment was entitled to full faith and credit under Article IV of the U.S. Constitution and 28 U.S.C. § 1738 (1982). 610 F.2d at 1329. Sylva is entitled, therefore, to bring an action in the Florida courts, or in federal district court in Florida assuming that diversity jurisdiction exists, to reduce the California Judgment to a local judgment, thereby allowing him to levy on these funds. *See First Nat. Bank of Searcy, Arkansas v. Collins,* 372 So.2d 111, 113 (Fla.App.Ct.1979); *National Equipment Rental, Ltd. v. Coolidge B & T Co.,* 348 So.2d 1236, 1238 (Fla.App.Ct.1977); *Milligan v. Wilson,* 107 So.2d 773, 774–75 (Fla.App.Ct.1958).

67. Such restoration of the settlement proceeds, attorney's fee and expenses is supported by precedent. Upon reversing a money judgment, an appellate court, drawing upon the equitable principle of restitution, may direct a party who has obtained satisfaction of the judgment to return the monies he has received to the party who paid them or, in the event a new trial is ordered, to deposit them in the trial court's registry pending the outcome of the new trial. *See Northwestern Fuel Co. v. Brock,* 139 U.S. 216, 219, 11 S.Ct. 523, 524, 35 L.Ed. 151 (1891); *Kirtley v. Abrams,* 299 F.2d 341, 347–48 (2d Cir.1962).

68. *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977) ("A 'mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law' will not suffice." (citing *Protective Committee v. Anderson,* 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968)); *see also Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147 (11th Cir.1983) ("[C]areful scrutiny by the court is 'necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class

The Bestline settlement the district judge approved was, as the *Piambino I* panel emphatically found, manifestly unfair. Lead Counsel's and the settling Bestline defendants' attempts to discredit the panel's conclusion are feeble and warrant no comment. The district court should have rejected the settlement as unfair because it was accomplished at the expense of the minority members of the plaintiff-class, primarily to provide Lead Counsel an attorney's fee. The Bailey settlement had been negotiated for the same purpose, and the district court should have taken this into account in passing on the Bestline settlement. We say this, even though the validity of the Bailey settlement was not before the court, because what motivated Lead Counsel to come to terms with Bailey had a bearing on the fairness, reasonableness, and adequacy of the Bestline settlement.

It should have been as obvious to the district court as it was to our prior panel that without the Bailey settlement there would have been no Bestline settlement on the terms the district court approved. Lead Counsel would not have agreed to the Bestline settlement because it would not have provided enough ready cash to pay the $1 million or more in fees and expenses Lead Counsel needed. To be sure, the Bestline defendants, collectively, were willing to pay $900,000 in cash and to "waive" any claim they might have had to the $500,-000 Rule 65(c) bond [69] the plaintiffs posted when the court enjoined Bestline's restitution payments to the California Fund, but Lead Counsel could not have expected the court to award them most of that money in the form of fees and expenses. Such an award would have been highly suspect and would have engendered strong opposition.

The Bailey settlement "sweetened the pot" and made the Bestline settlement palatable. In short, the United States' funds Bailey used to buy off the plaintiffs' claims enabled Lead Counsel to relax their demands against the remaining defendants and to settle for less.

The district court approved Lead Counsel's proposed attorney's fee because "no one opposed it"; Sylva's objection did not count because he was not a party. Such perfunctory approval, the *Piambino I* panel held, constituted a complete abdication by the court of "its responsibility to assess the reasonableness of attorneys' fees proposed under a settlement of a class action," 610 F.2d at 1328, and, standing alone, was sufficient to vitiate the settlement. *Id.* Of course, the settlement was also invalid because of its highly prejudicial treatment of the Minority Group.

The Rule 23 policies that dictate the conduct of the trial judge and plaintiffs' counsel in class actions simply cannot accommodate the decision Lead Counsel urge us to make, which would allow Lead Counsel and the settling plaintiffs to retain the proceeds of the Bestline settlement. Such a decision would inform the trial bar and the bench that a rubber stamped settlement and negotiated fee award found on appeal to be unfair, unreasonable, or inadequate will be set aside only in theory, not in truth; once the settlement proceeds and attorney's fee are disbursed, the court will not order their retrieval. It requires no further discussion to conclude that the result Lead Counsel propose cannot be countenanced. What is needed, instead, if we expect the public to have confidence in the rule of law, is a result that will ensure that the scenario in this case is not repeated.

members.'" (citing *United States v. City of Miami,* 614 F.2d 1322, 1331 (5th Cir.1980)); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir.1978) ("The [class action] settlement process is more susceptible than adversarial adjudications to certain types of abuse ... requiring that the trial court evaluate [the fairness of] the class action settlement....")

**69.** Bestline's claim to the Rule 65(c) bond was of dubious value. If the July 30, 1976 prelimi-

nary injunction were set aside on appeal, Sylva, as Compliance Officer under the California Judgment, would have a claim, as a wrongfully enjoined party, against the bond for the injury the participants in the California Fund incurred as a result of the injunction. *See infra* note 71. In addition, he could levy on the bond proceeds to satisfy the California Judgment. *See supra* note 66.

Lead Counsel argue that it will work a manifest injustice if we require them and their clients to return the monies they have received. We address Lead Counsel's case first, because the answer is so clear: no equities weigh in their favor.

Lead Counsel took a calculated risk when, three days after the district court entered the final judgment incorporating the Bestline settlement and in the face of a certain appeal by Sylva, they withdrew from the court's registry $1,000,000 in attorneys' fees (the fees Lead Counsel were to receive for the combined settlements). Sylva had done everything the law allowed to stop Lead Counsel's rush for these fees. He tried to intervene; he objected to the Bestline settlement and the negotiated attorney's fees; after the district court denied him intervention and approved the settlement, he moved the court to set aside the fee disbursement and to stay the execution of the final judgment; and, finally, he appealed to this court. Except for his motion to intervene, Sylva requested all of this action within six days of the entry of final judgment. His requests could hardly have been more timely.

Lead Counsel knew that Sylva's appeal was meritorious and that their settlement and fee award were in jeopardy. First, Lead Counsel knew that the June 30, 1976 injunction, without which there would have been no settlement, was entirely baseless. The injunction was precluded by the Anti-Injunction Act. Lead Counsel, ignoring the proscription of the Act, informed the court that they wanted the injunction because the California Judgment, in denying restitution to the Majority Group while providing it to the Minority Group, was denying the former group their fourteenth amendment rights to equal protection and due process. Lead Counsel knew this argument could not prevail because it had been explicitly rejected by the U.S. District Court for the Northern District of California on April 4, 1975, when it dismissed *with prejudice* a class-action suit Lead Counsel had brought on the precise claims they were prosecuting in this case. The California attorney general, in opposing the issuance of the injunc-

tion, pointed this out to the district court, and the court accordingly rejected Lead Counsel's argument. The district court nevertheless granted the injunction, for an invalid reason Lead Counsel did not urge—to aid the court in the exercise of its jurisdiction. Lead Counsel could not have been surprised when the *Piambino I* panel rejected it.

Lead Counsel also should have anticipated the panel's ruling on the district court's denial of Sylva's motion to intervene. Sylva, as the Minority Group's *de facto*, if not *de jure*, representative, obviously had a stake in the outcome of the litigation. Lead Counsel's constant pursuit of Sylva in the state and federal courts of California, in the court below and in this court stood as a tacit admission of this fact. Counsel knew that, if the panel concluded that Sylva had a right to intervene, their settlement would fall. The settlement would fall because Sylva had demonstrated that it was the product of a lawyer-client conflict of interest of prohibitive magnitude.

As stated, Lead Counsel have no equities going for them on the question of whether they should turn over the money they have received. Accordingly, the district court, on receipt of our mandate, shall forthwith order Lead Counsel to pay into the registry of the district court all the monies they have received in consequence of the Bestline settlement, whether in the form of an attorney's fee or expenses, with interest from the date *Piambino I*'s mandate issued. The court shall enforce such order under its civil contempt power.

The case against the Majority Group and the members of the Minority Group who participated in the settlement presents a different question. They of course have no right to the monies they have received; the Bestline settlement is a nullity and they have no independent claim to its proceeds. But they have done nothing "wrong." They played no active role in the events that led to the settlement and could not have known of the risk they took in receiving and disposing of the Bestline settle-

ment proceeds while the Sylva and Bestline appeals were pending in this court. One might argue that these plaintiffs should be faulted for choosing Lead Counsel as their lawyers, but we doubt that many of them participated in that decision. Nevertheless, these participating plaintiffs must restore the monies they have received to the court's registry. We reach this holding for two principal reasons.

First, Rule 23 requires such action; it will give the district judges and the plaintiffs' bar an added incentive to discharge in full and with appropriate professional care the supervisory and fiduciary duties the rule imposes upon them. In requiring restoration, we have not ignored the possible hardship it may impose upon the settling plaintiffs and the distaste it may engender in some quarters. The Rule 23 policies we have cited, however, outweigh these factors. Moreover, it is quite apparent that the implicit remedy *Piambino I* prescribed was not strong enough; so we go one step further and make it explicit.

Second, as between the non-participating members of the Minority Group and the plaintiffs who benefitted from the settlement, the equities lie with the former. *Piambino I* made this abundantly clear, and nothing has transpired since that decision came down to alter the picture. These plaintiffs will simply have to turn to their lawyers for redress. Whether they can call upon Lead Counsel to indemnify them or otherwise make them whole is a question that is not before us, and we intimate no opinion thereon. We do recognize, however, that it would not be far fetched for these plaintiffs to lay claims against Lead Counsel; this recognition is why, in the discussion that follows in Subpart C, we disqualify Lead Counsel from further professional participation in this case, except to represent themselves *pro se*. Before we turn to this discussion, however, we must deal with the $500,000 injunction bond the

district court dissolved so that it could be treated as part of the settlement proceeds.

The parties treated the bond money as part of the settlement proceeds because, under the terms of the settlement, Bestline "waived" any claim it might have had to the money. The district court erred in approving the transfer of this money from the registry of the court, where it stood as a bond, to Lead Counsel and their clients, because Bestline's appeal from the injunction was still alive. Lead Counsel point out, in defense of the court's action, that the settlement agreement called for Bestline to abandon its appeal; thus, the bond was not needed for its protection. This does not end the matter, however.

Rule 65(c) requires a party obtaining an injunction to post a bond "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The parties "enjoined or restrained" in this case were Bestline *and* Sylva. Inexplicably, the court ordered one of the enjoined parties, Bestline, to post the applicant's bond.

Bestline did not need the bond to secure it from loss, since, except for the $500,000 placed in the court's registry, the injunction allowed it to retain monies that would have gone to the California Fund. As for the $500,000, Bestline did not need the bond;[70] that sum was as "secure" in the court's registry as it would have been in Bestline's own coffers.

The party who needed a bond was Sylva, and he needed one for a sum far in excess of $500,000. His potential loss was the amount Bestline still owed on the California Judgment. Thus, the court's dissolution of the injunction bond deprived Sylva of a source of recompense in the event the *Piambino I* panel vacated the injunction.

 We have not had the occasion to decide whether a party who receives the proceeds of a cash injunction bond dis-

**70.** One could argue that Bestline needed the bond to cover the interest it would have earned on the $500,000 during the life of the injunction. Assuming, however, that the clerk of the court

deposited the bond money in an interest bearing account, a practice ordained by the Judicial Conference of the United States, Bestline could hardly have suffered even a loss of interest.

solved pending appeal must redeposit them when the injunction is vacated as improvidently granted. Other circuits have decided this question, however, holding that a prematurely dissolved bond must be redeposited. The Tenth Circuit's rationale is persuasive. In *Atomic Oil Co. of Oklahoma v. Bardahl Oil Co.*, 419 F.2d 1097 (10th Cir.1969), *cert. denied*, 397 U.S. 1063, 90 S.Ct. 1500, 25 L.Ed.2d 685 (1970), a case, like the one here, involving the dissolution of an injunction bond pending appeal, the court noted the absolute nature of Rule 65(c)'s bond requirement: before a court may issue a preliminary injunction, a bond *must* be posted. This requirement, the court found, was intended by Congress to protect enjoined parties from the losses that result from improvidently granted injunctions. The court observed that, if it did not mandate the reposting of the bond, trial judges might pay mere lip service to both the letter and spirit of Rule 65(c). *Id.* at 1101. *See also Northeast Airlines, Inc. v. Nationwide Charters & Conventions, Inc.*, 413 F.2d 335, 338 (1st Cir.1969); *but see Buddy Systems, Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164 (9th Cir.1976), *cert. denied*, 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977).

The consequences that can flow from the premature dissolution of a Rule 65(c) bond are evident in the instant case. Unless the bond, here, is reposted, Sylva, as Compliance Officer for the California Judgment, will lose a vital remedy, the recovery of damages against the bond, the law affords a party who has been wrongfully enjoined. We therefore hold, and instruct the district court, that the first $500,000 Lead Counsel

and the settling plaintiffs restore to the court's registry shall replace the dissolved bond.[71]

## C.

▪ The preceding discussion leads inexorably to the question of Lead Counsel's future role as an advocate for the plaintiffs in these proceedings. Perhaps the question is rhetorical, having been answered by Lead Counsel's professional performance in this case.

Before proceeding further, we think it important to restate some observations that have been made by lawyers and judges about class actions and, in particular, the delicate role of the class lawyer. It has been said that class actions are "strike suits promoted by attorneys who simply are seeking fat fees"[72] and that nothing has created as much "cynicism at the bar" as the settlement negotiations in class actions and the "accompanying maneuvering for fees."[73] In Chief Judge Lumbard's view, "[t]he only persons to gain from a class suit are not potential plaintiffs, but the attorneys who will represent them."[74] "When counsel for the [plaintiff-]class negotiates simultaneously for the settlement fund and for individual counsel fees there is an inherent conflict of interest."[75] The defendant, and therefore its counsel, is "uninterested in what portion of the total payment will go to the class and what percentage will go to the class attorney;"[76] accordingly, the defense operates as no brake against the invidious effects of such a conflict of interest.

---

**71.** In reaching this conclusion, we note that Bestline makes no claim whatever to the $500,000. We thus need not decide the question of whether an enjoined party (Bestline) who has been wrongfully required to post a Rule 65(c) bond for the benefit of another enjoined party (Sylva) is entitled to the return of the bond before the latter party can proceed against it.

**72.** *Foster v. Boise-Cascade, Inc.*, 420 F.Supp. 674, 680 (S.D.Tex.1976) (citing 7A C. Wright & A. Miller, Federal Practice and Procedure, § 1803, at 104 (Supp.1976)), *aff'd* 577 F.2d 335 (5th Cir.1978).

**73.** *Id.* at 680 n. 4.

**74.** *Eisen v. Carlisle & Jacquelin* (Eisen II), 391 F.2d 555, 571 (2d Cir.1968) (Lumbard, C.J., dissenting).

**75.** Manual for Complex Litigation § 1.46, at 120 (Tent.Draft, 5th Rev.)

**76.** *Foster v. Boise-Cascade, Inc.*, 420 F.Supp. 674, 686 (S.D.Tex.1976), *aff'd* 577 F.2d 335 (5th Cir.1978).

When the class attorneys succeed in reaping "a golden harvest of fees" [77] in a case involving a relatively small recovery, the judicial system and the legal profession are disparaged. As Judge Moore has observed, "[t]he practice of awarding attorneys' fees is one that has been 'delicate, embarrassing and disturbing' for the courts. (citations omitted). This embarrassment is rooted in the fact that 'the bitterest complaints [about the legal profession] from laymen [are directed at] the windfall fees and featherbedding that lawyers have managed to perpetuate through ... their influence with the judiciary.' " [78] "For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so." [79]

In an effort to avoid the sort of abuse and "sharp" professional practice these quotations describe, Rule 23 imposes heavy burdens on the court and plaintiffs' counsel. In the situation before us, for example, "by asserting a representative role on behalf of the alleged class [as Lead Counsel did when they filed this suit, Lead Counsel] voluntarily accepted a fiduciary obligation towards the members of the pu-

tative class they [undertook] to represent. They [could] not abandon the fiduciary role they assumed at will or by agreement with the [defendants], if prejudice to the members of the class they claimed to represent would result or if they have improperly used the class action procedure for their personal aggrandizement." [80] Moreover, once the court below determined the class and designated Lead Counsel as the lead attorneys in this case, they commenced to serve "in something of a position of public trust.[81] Consequently, [they] share[d] with the court the burden of protecting the class action device against public apprehensions that it encourages strike suits and excessive attorneys' fees." [82]

The plaintiff-class, as an entity, was not Lead Counsel's client in this case. Rather, Lead Counsel continued "to have responsibilities to each individual member of the class even when negotiating" [83] the settlement now in question. By definition, these responsibilities extended to the Minority Group.[84]

When very early in this case Lead Counsel found themselves in a conflict of interest with the Minority Group, they became, under Rule 23, " 'generally [un]able to conduct the litigation' and there [was] inadequate representation of the [Minority

77. *Free World Foreign Cars, Inc. v. Alfa Romeo,* 55 F.R.D. 26, 30 (S.D.N.Y.1972).

78. *City of Detroit v. Grinnel Corp.,* 495 F.2d 448, 469–70 (2d Cir.1974) (citing Graham, Guest Opinion on Legal Fees: Fluffing the Golden Fleece, Juris Doctor, 10, 11 (February 1973)).

79. *Id.*

80. *Shelton v. Pargo,* 582 F.2d 1298, 1305 (4th Cir.1978).

81. As the Second Circuit's observation in *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.,* 481 F.2d 1045, 1050 (2d Cir.), *cert. denied,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973), amplified this point:

"One accepting employment as counsel in a class action does not become a class representative through simple operation of the private enterprise system. Rather, both the class determination and designation of counsel as class representative come through judicial determinations, and the attorney so benefited

serves in something of a position of public trust. Consequently, he shares with the court the burden of protecting the class action device against public apprehensions that it encourages strike suits and excessive attorneys' fees."

82. *Alpine Pharmacy,* 481 F.2d at 1050.

83. *Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832, 835 (9th Cir.1976).

84. These responsibilities are reflected in Canons 5 and 7 of the Code of Professional Responsibility, American Bar Association, as amended February, 1975. Canon 5 requires the lawyer to "exercise independent professional judgment on behalf of a client" and Canon 7 requires a lawyer to "represent a client zealously within the bounds of law." Ethical Considerations (EC) 5–14, 5–15, 5–16, and 5–17 caution the lawyer to refrain from representation of multiple clients having "potentially differing interests." *Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d at 835, n. 4.

Group's] interest." [85] Lead Counsel certainly knew, or should have known, that "the presence of the ... conflict would create divided loyalties which would constitute inadequate representation." [86] They knew, as class-action lawyers, that

> [t]he interests of lawyer and class may diverge, as may the interest of different members of the class, and certain interests may be wrongfully compromised, betrayed, or "sold out" without drawing the attention of the court. For this reason, in addition to requiring that the trial court evaluate whether a class action settlement is "fair, adequate and reasonable and is not the product of collusion between the parties", ... the law accords special protections, primarily procedural in nature, to individual class members whose interests may be compromised in the settlement process. These protections include notice, ensuring that class members know when their rights are being compromised, and an opportunity to voice objections to the settlement.[87]

In this case, it is beyond peradventure that the notice Lead Counsel prepared and, with court approval, sent to the Minority Group concerning the Bestline settlement, and the Bailey settlement as well, did not inform the members of that Group that their rights were being compromised, if not foreclosed altogether, and that they would have a chance to object in open court. "In such a situation, [Lead Counsel's] duty to the [Minority Group] require[d them] to point out [to the court their conflict with the Minority Group] so that the court [could] take appropriate steps to protect the interests of [these] absentee class members." [88]

As far as we can tell from the record, Lead Counsel have *never* confessed that they had an irreconcilable conflict of interest with the Minority Group and that they could no longer represent that segment of the plaintiff-class. Nor have they ever suggested that the Minority Group was in need of separate counsel; on the contrary, they have steadfastly argued, usually in opposition to Sylva's entreaties in behalf of the Minority Group, that these class members needed no representation other than that they were affording them. Lead Counsel have adhered to this position throughout, even when they argued to the district court, after the *Piambino I* mandate issued, that the Minority Group should be deleted from the class because they had formally released their claims against Bestline. Bestline, itself, had not gone that far.

Exercising our power to supervise the district courts, we bring an end to Lead Counsel's role as class attorneys in this case. Appellate courts have invoked their "supervisory power" in a wide variety of situations. Initially, this power was used to formulate rules in criminal proceedings, which, although not constitutionally mandated, ensured fairness in the criminal process. *See, e.g., McNabb v. United States,*

---

85. *In re Fine Paper Antitrust Litigation,* 617 F.2d 22, 27 (3d Cir.1980) (quoting *North American Acceptance v. Arnall, Golden & Gregory,* 593 F.2d 642, 644 (5th Cir.1979)).

86. *Id.*

87. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), *cert. denied,* —— U.S. ——, 104 S.Ct. 3515, 82 L.Ed.2d 824 (1984); *cert. dismissed,* —— U.S. ——, 104 S.Ct. 3526, 82 L.Ed.2d 833 (1984).

88. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d at 1176. The court below should have sensed Lead Counsel's conflict with the Minority Group, especially after Lead Counsel moved the court to enjoin the June 30, 1976 payment from Bestline to the California Fund on the ground that the Fund's distribution of restitution payments solely to the Minority Group violated the Majority Group's fourteenth amendment rights to due process and equal protection. "[T]he trial court has the continuing duty to monitor the status, as to possible conflict, of the class attorneys to assure that the class is adequately represented. *North American Acceptance v. Arnall, Golden & Gregory,* 593 F.2d 642, 645 (5th Cir.1979). 'If at any time the trial court realizes that class counsel should be disqualified, it is required to take appropriate action.' *Id.*" *In Re Fine Paper Antitrust Litigation,* 617 F.2d at 27. Appropriate action in the instant case would have involved, at the very least, the designation of the Minority Group as a subclass with the right to have separate counsel unbeholden to Lead Counsel.

318 U.S. 332, 340–41, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). Later, the courts invoked their supervisory power to formulate rules of civil litigation. *See, e.g., Klapprott v. United States*, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 1099 (1949) (citizenship may not be revoked by default judgment); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 710–11 (7th Cir.1979) (court requires that trial briefs henceforth be exchanged before rather than after trial to avoid prejudicing the parties), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). Despite the wide variety of situations in which supervisory power has been invoked, the objective behind its use—fashioning procedures and remedies that ensure that the judicial process remains a fair one—has not varied.

It is patently clear, as the record shows, that Lead Counsel have, from start to finish, been in diametric opposition to the interests of the Minority Group and that they cannot possibly continue to represent them. Lead Counsel are also in irretrievable conflict with the Majority Group. By today's decision, Lead Counsel will be required to pay to the registry of the district court $800,000 in fees and reimbursed expenses. As they advised us in oral argument, that money has been spent, and they do not have the resources to pay it back. Whatever course Lead Counsel choose to follow in an effort to extricate themselves from their present dilemma, one thing is clear: if allowed to remain in this case, they would have a compelling interest in negotiating a settlement that covers their losses. Lead Counsel manifested the extent of their compelling interest in the district court, following the issuance of the *Piambino I* mandate, when they urged the court to circumvent that mandate. Thus, any settlement they might arrange would, indeed, be suspect, even if, in truth, it was "fair, adequate and reasonable." Lead Counsel's representation of the plaintiff-class in this case is therefore terminated.

## III.

In summary, we hold as follows:

First, David R. Sylva, as an intervenor in behalf of the Minority Group, is a party plaintiff in this case. The district court shall recognize him as such and shall certify the Minority Group as a plaintiff-subclass upon receipt of our mandate.

Second, Lead Counsel shall pay into the registry of the district court the attorney's fee and reimbursed litigation expenses they received in connection with the Bestline settlement, with interest at the legal rate from the date of this court's issuance of the mandate in *Piambino I*. Immediately upon its receipt of our mandate, the district court shall *instanter*, without a hearing, issue an order directing Lead Counsel to deposit such amount in the court's registry within thirty days of the date of its order. The order shall recite that Lead Counsel's failure to comply therewith shall subject them to the district court's contempt power.

Third, each of the class plaintiffs who received proceeds of the Bestline settlement shall pay the total amount of such proceeds into the registry of the district court, with interest from the date the clerk of the court disbursed such proceeds to them. Immediately upon its receipt of our mandate, the district court shall *instanter*, without a hearing, issue an order directing that each such plaintiff deposit the amount of the proceeds he received in the court's registry within thirty days of the date of its order. The order shall recite that failure of such plaintiff to comply therewith shall subject him to the district court's contempt power.

Fourth, the first $500,000 deposited in the registry of the district court pursuant to this mandate shall be set aside as a Fed.R.Civ.P. 65(c) bond, against which bond Sylva may claim damages, in behalf of those qualified to receive disbursements from the California Fund, caused by the district court's issuance of the June 30, 1976 preliminary injunction.

Fifth, with the exception of the $500,000 mentioned in paragraph fourth, the funds deposited in the registry of the district

court pursuant to this mandate shall be subject to levy by Sylva in the enforcement of the California Judgment.[89]

Sixth, nothing in this decision shall be construed to preclude Sylva from pursuing the execution of the California Judgment, by writ of execution, attachment, garnishment or other procedure, against Lead Counsel or any plaintiff who received proceeds of the Bestline settlement.

Seventh, Lead Counsel are barred from appearing as counsel for any party in this case, save themselves, effective as of the date this opinion is published.

Eighth, on receipt of our mandate, the district court shall appoint counsel to represent the members of the plaintiff-class comprising the Majority Group, in the event such class members are unable to employ counsel.

Ninth, neither *Piambino I* nor this decision has adjudicated the lawfulness of the Bailey settlement, since no appeal has ever been taken from the district court's partial final judgment approving that settlement. We therefore intimate no opinion as to the validity thereof.

All orders of the district court, including those set forth in this opinion, which are inconsistent with this opinion are VACATED and the cause is REMANDED for further proceedings.

VACATED and REMANDED, with instructions.

**89.** *See supra* note 66.